ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095T

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF ORANGEBURG | IN THE COMMON PLEAS COURT<br>FIRST JUDICIAL CIRCUIT |
| **MICHELLE LUQUIRE, ISABELLE JONES AND L.T. WILSON, INDIVIDUALLY AND ON BEHALF OF OTHER SIMILARLY SITUATED PLAINTIFFS**<br><br>     **Plaintiffs,**<br><br> **v.**<br><br>**SOUTH CAROLINA ELECTRIC AND GAS COMPANY; SCANA CORPORATION; KEVIN MARSH; STEPHEN BYRNE; JIMMY ADDISON; GREGORY E. ALIFF; JAMES A BENNETT; JOHN F.A.V. CECIL; SHARON A. DECKER; LYNNE M. MILLER; JAMES W. ROQUEMORE; ALFREDO TRUJILLO; MACEO K. SLOAN, DOMINION ENERGY CORPORTATION, DOMINION ENERGY SOUTH CAROLINA INC., DOMINION ENERGY SERVICES, INC. and SEDONA CORPORATION**<br><br>     **Defendants.** | CIVIL ACTION NO. 2019-CP-_____<br><br><br>**SUMMONS** |

TO THE DEFENDANTS ABOVE NAMED:

   **YOU ARE HEREBY SUMMONED** and required to make a written Answer to the Complaint in the above captioned action, a copy of which Complaint is herewith served upon you, and to serve a copy of your written Answer to the said Complaint upon the undersigned within thirty (30) days after service hereof, exclusive of the day of such service.

   **YOU ARE HEREBY GIVEN NOTICE FURTHER** that if you fail to appear and defend and fail to answer the Complaint as required by this Summons within thirty (30) days after the service hereof, exclusive of the day of such service, judgment by default will be entered against you for the relief demanded in the Complaint.

**BELL LEGAL GROUP, LLC**

_s/ J. Edward Bell, III_
J. Edward Bell, Esq. (SC Bar #631)
Gabrielle A. Sulpizio, Esq.
BELL LEGAL GROUP
219 N. Ridge Street
Georgetown, SC 29440
(843) 546-2408 Phone
(843) 546-9604 Fax

ebell@edbelllaw.com

July 18, 2019
Georgetown, South Carolina

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

| | |
|---|---|
| STATE OF SOUTH CAROLINA<br>COUNTY OF ORANGEBURG | IN THE COMMON PLEAS COURT<br>FIRST JUDICIAL CIRCUIT |
| | CIVIL ACTION NO. 2019-CP-_____ |
| **MICHELLE LUQUIRE, ISABELLE JONES AND L.T. WILSON, INDIVIDUALLY AND ON BEHALF OF OTHER SIMILARLY SITUATED PLAINTIFFS**<br><br>**Plaintiffs,**<br><br>v.<br><br>**SOUTH CAROLINA ELECTRIC AND GAS COMPANY; SCANA CORPORATION; KEVIN MARSH; STEPHEN BYRNE; JIMMY ADDISON; GREGORY E. ALIFF; JAMES A BENNETT; JOHN F.A.V. CECIL; SHARON A. DECKER; LYNNE M. MILLER; JAMES W. ROQUEMORE; ALFREDO TRUJILLO; MACEO K. SLOAN; DOMINION ENERGY CORPORTATION; DOMINION ENERGY SOUTH CAROLINA INC.; DOMINION ENERGY SERVICES, INC.; and SEDONA CORPORATION**<br><br>**Defendants.** | **COMPLAINT<br>(CLASS ACTION)<br>(JURY TRIAL REQUESTED)<br>(CLASS CERTIFICATION REQUESTED)** |

NOW COMES, the Plaintiffs Michelle Luquire, Isabelle Jones and L.T. Wilson, individually and on behalf of other similarly situated Plaintiffs, and would respectfully show unto this Court:

## JURISDICTION AND VENUE

1.      Venue is appropriate in Orangeburg County since one or more of the Defendants reside in Orangeburg County and one or more of the Defendants transact business in Orangeburg County.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

## PARTIES

2.    Plaintiff, Michelle Luquire, is a resident of Georgetown County and owns property in Georgetown County. Mrs. Luquire purchases her electrical power for her Georgetown County property directly from Santee Cooper. Mrs. Luquire also owns a company which pays for power and electricity from Santee Cooper.

3.    Plaintiff, Isabelle Jones, is a resident of Georgetown County and purchases her electrical power for her Georgetown County property from a co-op which purchases the electrical power in bulk from Santee Cooper.

4.    Plaintiff, L.T. Wilson, is a resident of Georgetown County and owns property in Georgetown County and owns a business also in Georgetown County.  Both Mr. Wilson's residence and his business purchase electrical power from Santee Cooper.

## CLASS ACTION REPRESENTATION  ALLEGATIONS

5.     Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated.

6.    The proposed class is initially defined as:

   a. All individuals and/or entities that paid power bills on any account to the South Carolina Public Service Authority (hereinafter Santee Cooper) or the Co-ops or municipalities (who purchased power from Santee Cooper at an increased rate for the construction of the nuclear project up to present date and continued payment of **increased rates after the date of this Complaint in excess of $100.00 (the "Direct Class");**

   b. All individuals and/or entities that paid power bills on any account to the South Carolina Public Service Authority (hereinafter Santee Cooper) or the Co-ops (who purchased power from Santee Cooper at an increased rate for the construction of the nuclear project on a new account setup after the date of this Complaint in excess of $100.00 (the "Indirect Class");

7.    Excluded from the Class are:

   a. SCANA, its legal representatives, elected officials, officers, directors, assigns, and successors;

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

b. SCE&G, its legal representatives, elected officials, officers, directors, assigns, and successors;

c. SCANA Services, its legal representatives, elected officials, officers, directors, assigns, and successors;

d. The judge, magistrate, and any special master to whom this case is assigned, and any member of their immediate families; and

e. To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the plaintiff class.

8.     Pursuant to Rule 23, S.C.R.C.P., and as otherwise alleged in this section, the introduction, and the below counts, Defendants have acted or refused to act on grounds generally applicable to all the members of the class.

9.     This Complaint has met all statutory requirements of Rule 23 of South Carolina Rules of Civil Procedure for certification:

a. The members of the class are so numerous that joinder of all members is impractical. Although a more precise number of class members will be better established as part of a class notification, upon information and belief, the number of potential members consists of 661,000 residential retail and wholesale customers.

b. There are several common questions of law and/or facts common to the class including but not limited to:

i. Determination of the facts concerning, whether the Defendants breached their fiduciary duty to the Plaintiffs when managing the monies for the Project;

ii. Determination of the facts concerning, whether the Defendants were negligent, grossly negligent, and reckless with the management and oversight of the Project;

iii. Determination of the facts concerning, whether the Defendants committed fraud, intentionally misrepresented the facts, or negligently misrepresented the facts concerning the Project to the Public Service Commission, the Plaintiffs, and the public;

iv. Determination of the facts concerning, whether the SCANA Board of Directors breached one or more statutory or fiduciary duties;

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095T

    v.   Determination of the facts concerning, whether SCANA, SCE&G, SCANA Services, Marsh, Byrne, and Addison and the Board of Directors of SCANA breached duties to Santee Cooper's direct and indirect customers in failing to provide sufficient supervision and oversight of the Project;

    vi.   Determination of the facts concerning, whether Defendants Marsh, Byrne and/or Addison breached there duties to Santee Cooper's direct and indirect customers in failing to provide sufficient management and oversight of the Project, and project management and whether they misrepresented material information to the PSC, the Plaintiffs, to Santee Cooper and the public;

    vii.   Determination of the facts concerning, whether the Defendants made promises made to the Plaintiffs through the Public Service Commission which were relied upon by Plaintiffs for the higher payment of rates and were not fulfilled.

c.  The claims asserted by the Plaintiffs are typical of the claims of the members of the Class in that their claims involve the same facts as otherwise alleged in this section, the introduction, and the below counts, arise from the same practices or course of conduct that gives rise to the claims of all other class members, and are based on the same legal theories.

d.  The representative parties will fairly and adequately protect the interests of the class:

    i.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy – where individual class members lack the financial resources to vigorously prosecute a lawsuit against individual and corporate Defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. Because the losses, injuries, and damages suffered by each of the individual S.C. Rule 23 Class Members are small in the sense pertinent to a class action analysis, the expenses and burden of individual litigation would make it extremely difficult or impossible for the individual S.C. Rule 23 Class Members to redress the wrongs done to them. On the other hand, important public interests will be served by addressing the matter as a class action. The adjudication of individual litigation claims **would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual S.C. Rule 23 Class Members would create a risk of inconsistent and/or varying adjudications with respect to the individual S.C. Rule 23 Class Members, establishing incompatible standards of conduct for Defendants and resulting in impairment of the S.C. Rule 23 Class Members' rights and the disposition of their interests through actions to which they were not parties.**

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

ii.   Plaintiffs are adequate representatives of the class because their interests do not conflict with the interest of the members of the class they seek to represent, they adequately and truly represent the interests of the members of the absent members, they have common claims with each class member based on the same essential facts, they have retained counsel competent and experienced in class action and complex class action litigation, and they intend to prosecute this action vigorously.

iii.   This class shall exclude (a) all attorneys and their staff representing the putative class, (b) all members of the judiciary presiding over this case, and (c) the Defendants, including all Defendants' agents, officers, and directors.

10.   The class, as defined above, involves only Class members for whom the amount in controversy exceeds one hundred dollars ($100.00).

## **DEFENDANTS**

11.   Defendant, South Carolina Electric and Gas Company (SCE&G) is a Company organized and existing pursuant to the laws of the State of South Carolina and maintains a registered office 1703 Laurel Street, Columbia, Richland County, South Carolina.  SCE&G does business or owns land in virtually every county in South Carolina and transacts business in Orangeburg County.

12.   Defendant, SCANA Corporation is a Corporation organized and existing pursuant to the laws of the State of South Carolina and maintains a registered office at 1703 Laurel Street, Columbia, Richland County, South Carolina.  SCANA does business or owns land in virtually every county in South Carolina either in its own name or in one or more of its subsidiaries and transacts business in Orangeburg County.

13.   At all times relevant to this complaint, Defendant SCANA Services, Inc, has been a South Carolina Corporation, and a primary subsidiary of Defendant SCANA, and was responsible for providing services to both SCANA and SCE&G and employed the professional staff at the V.C. Summer project, including one or more Individual SCANA Defendants.  During

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

relevant times in the construction of the nuclear plants, SCANA services improperly charged to the project various charges that were part of the overcharging of costs and expenses that adversely affected the Plaintiffs.   SCANA Services, Inc, transacts business in Orangeburg County.

14.    Defendant, SCE&G and SCANA Services, Inc. were  at all relevant times herein a subsidiary of SCANA Corporation (hereinafter collectively referred to with SCE&G as "SCANA").

15.    Defendant Marsh served as Chairman of the Board and Chief Executive Officer ("CEO") of SCANA from December 2011 until October 2017 and as SCANA director from 2011 to December 21, 2017. Marsh was also the Chairman of the Board's Executive Committee at relevant times. As stated in the Company's public filings with the SEC, for 2015 and 2016, Marsh improperly and unlawfully received total compensation of $5,733,258 and $6,108,804, respectively. Upon information  and belief, Marsh is a citizen of South Carolina.

16.    Defendant Stephen A. Byrne ("Byrne") has served as an Executive Vice President of SCANA, as well as President of Generation and Transmission and Chief Operating Officer of SCE&G. As stated in the Company's 2017 Proxy Statement filed on Form DEF 14A with the SEC on March 24, 2017 (the "2017 Proxy"), Byrne's "nuclear responsibilities include overseeing the construction of [the Nuclear Project]." 2017 Prox y at 28.  According to the Company's public filings, for 2015 and 2016, Byrne improperly and unlawfully received  total compensation  of  $2,314,038  and $2,582,141, respectively.  Upon information and belief, Byrne is a citizen of South Carolina.

17.    Defendant Jimmy Addison ("Addison") was appointed Executive Vice President of SCANA in January 2012, and he has served as the Company's CFO since April 2006.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

According to the Company's public filings, for 2015 and 2016, Addison improperly and unlawfully received total compensation of $2,405,419 and $2,580,874, respectively. Upon information and belief, Addison is a citizen of South Carolina.

18.    Defendant Gregory E. Aliff ("Aliff") has served as a director of the Company since October 2015. Aliff has served as the Chairman of SCANA's Audit Committee and as a member of the Company's Executive and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016, Aliff improperly and unlawfully received total compensation of $48,250 and $213,500, respectively. Upon information and belief, Aliff is a citizen of Virginia.

19.    Defendant James A. Bennett ("Bennett") has served as a director of the Company since 1997. Bennett serves as the Chairman of the Company's Compensation Committee and is a member of the Company's Executive and Audit Committees. Bennett was a member of the Nuclear Committee. According to the Company's public filings, for 2015 and 2016, Bennett improperly and unlawfully received total compensation of $194,157 and $215,867 respectively. Upon information and belief, Bennett is a citizen of South Carolina.

20.    Defendant John F.A.V. Cecil ("Cecil") has served as a director of the Company since 2013. Cecil has served on the Company's Audit and Compensation Committees. According to the Company's public filings, for 2015 and 2016, Cecil improperly and unlawfully received total compensation of $193,000 and $206,000, respectively. Upon information and belief, Cecil is a citizen of North Carolina.

21.    Defendant Sharon A. Decker ("Decker") has served as a director of the Company since October 2015. Decker previously served as a director of the Company from 2005 until April 2013. Decker has served on the Company's Compensation and Nuclear Committees.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

According to the Company's public filings, for 2015 and 2016, Decker improperly and unlawfully received total compensation of $48,250 and $206,000, respectively. Upon information and belief, Decker is a citizen of North Carolina.

22.     Defendant Lynne M. Miller ("Miller") has served as a director of the Company since 1997. During the Relevant Period, Miller has served on the Company's Audit and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016, Miller improperly and unlawfully received total compensation of $197,000 and $206,000, respectively. Upon information and belief, Miller is a citizen of Virginia.

23.     Defendant James W. Roquemore ("Roquemore") has served as a director of the Company since 2007. Roquemore served as the Chairman of the Company's Nuclear Committee and on SCANA's Executive and Compensation Committees. According to the Company's public filings, for 2015 and 2016, Roquemore improperly and unlawfully received total compensation of $197,000 and $216,000, respectively. Upon information and belief, Roquemore is a citizen of South Carolina.

24.     Defendant Maceo K. Sloan ("Sloan") has served as a director of the Company since 1997. Sloan has served on the Company's Nuclear Oversight and Compensation Committees, including as Chairman of the Compensation Committee, and as a member of SCANA's Executive Committee. According to the Company's public filings, for 2015 and 2016, Sloan improperly and unlawfully received total compensation of $201,000 and $210,000, respectively. Upon information and belief, Sloan is a citizen of North Carolina.

25.     Defendant Alfredo Trujillo ("Trujillo") has served as a director of the Company since 2013. Trujillo has served on the Company's Nuclear Oversight and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016,

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

Trujillo improperly and unlawfully received total compensation of $193,000 and 206,000, respectively. Upon information and belief, Trujillo is a citizen of Georgia.

26.     Defendant James M. Micali ("Micali") served as a director of the Company from 2007 until the 2017 Annual Meeting, when he retired as a result of his reaching mandatory retirement age. During part of the Relevant Period, Micali served as a member of the Audit, Compensation and Executive Committees and served as Chairman of the Nominating and Governance Committee. According to the Company's public filings, for 2015 and 2016, Micali improperly and unlawfully received total compensation of $201,000 and 215,000, respectively. Upon information and belief, Micali is a citizen of Massachusetts.

27.     Defendant Harold C. Stowe ("Stowe") served as a director of the Company from 1999 until the 2016 Annual Meeting, as a result of his reaching mandatory retirement age. Stowe served as Lead Director and as a member of the Audit, Compensation, Executive, and Nominating and Governance Committee. According to the Company's public filings, for 2015 and 2016 Stowe received total compensation of $211,245 and $106,105 respectively. Upon information and belief, Stowe is a citizen of South Carolina.

28.     The BOD of SCANA possessed the power and authority to control decisions related to the nuclear power plant management and construction, contents of SCANA's SEC filings, press releases, and other marketing communications. Because of their positions with the Company, and their access to material information available to them, but not to the public, the Defendants knew that many of the adverse facts specified herein and others had not been disclosed to and were being concealed from the public, and that the public and positive representations being made to third parties were then materially false and misleading and are thus liable for the false statements, fraud, and omissions pleaded herein. The Defendants were

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

also fiduciaries to the Plaintiffs after demanding "control" and management of the Project and knew that they had assumed a fiduciary relationship to not only their own rate payers but those customers of Santee Cooper.   As a result of assuming this special relationship with Santee Cooper ratepayers, were responsible for their actions which were not fair, reasonable and honest.

29.   The Defendants Dominion Energy Corporation, Dominion Energy South Carolina, Inc., Dominion Energy Services, Inc. and Sedona Corporation ("Dominion")  are a group of companies that do business within and throughout South Carolina and are included in this Complaint due to its purchase of SCANA and its related businesses in which Dominion contracted to accept liability of actions taken by SCANA.  The allegations in this Complaint only refer to Dominion if Dominion is specifically named and the term "Defendants" only refers to Dominion in the capacity of "ownership" of the other Defendants and their assumption of liability for their actions.

## **INTRODUCTION**

### I.    NATURE OF THE ACTION

30.    This is a claim for damages against the Defendants stemming from Defendants' egregious breaches of fiduciary duties, misrepresentations, failure to correct known public statements that were false, their negligent, grossly negligent and reckless conduct, their conspiracy to commit fraud and other wrongs committed from the beginning of the Nuclear Project and at  least August 1, 2015 through the present  relating to SCANA's construction and ultimate abandonment of two nuclear reactors at the V.C. Summer Nuclear Generating Station near Jenkinsville, South Carolina (the "Nuclear Project"). SCANA and its  partner, The South Carolina Public Service Authority (Santee Cooper) spent approximately $9 billion on the failed Nuclear Project. As a result of Defendants'  breaches, Plaintiffs have been made to pay higher utility bills due to the extra charges incurred by Santee Cooper resulting from the

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095?

mismanagement and fraudulent conduct of the Defendants.

31.     SCANA is an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"), is a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina. SCE&G and the South Carolina Public Service Authority, a state-owned utility that is also known as Santee Cooper, jointly own the V.C. Summer plant in Fairfield County, South Carolina. SCE&G is the plant operator of V.C. Summer.

32.     In 2007, SCANA successfully lobbied the South Carolina legislature to pass new legislation that would allow it to construct two new nuclear reactors at V.C. Summer. Also in 2007, South Carolina passed a law called the Base Load Review Act ("BLRA"), which allows utilities to pass power plant capital financing onto customers. SCANA used the BLRA to increase rates for SCE&G customers in order to pay for the failed Nuclear Project. The improperly incurred cost overruns were also paid by Santee Cooper that passed the increased costs onto its customers, the Class Plaintiffs.

33.     SCANA initially projected that the first reactor would be on-line and generating power as early as 2016, and the second by 2019. The total projected cost at the time was $9.8 billion and was referred to as one of the most ambitious construction efforts in South Carolina history. After going through multi-year federal and state approval processes, SCANA, along with Santee Cooper, began construction on the Nuclear Project in March 2013. SCANA's lead contractor for the Nuclear Project was Westinghouse Electric Company ("Westinghouse").

34.     The Nuclear Project immediately began to experience significant delays and runaway costs. SCANA received extensive warnings about these problems early in the Nuclear

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

Project's construction but did little to remedy the situation. Indeed, SCANA continued to petition the South Carolina Public Service Commission ("PSC") for further rate increases and schedule extensions. As issues worsened, SCANA's partner on the Nuclear Project, Santee Cooper, pressured SCANA to hire construction firm Bechtel to perform an in-depth analysis of the viability of the Nuclear Project. SCANA did not want to hire Bechtel – Santee Cooper insisted. In August 2015, the full SCANA Board and Defendants herein, approved a proposal to retain Bechtel to assess the Nuclear Project, with findings to be presented later that year.

**The Original Betchel Report**

35.     Bechtel presented its initial findings to SCANA in October 2015 and issued its first report (the "Original Bechtel Report") on November 9, 2015. The Original Bechtel Report made clear that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020 – a crucial deadline for SCANA to be eligible for $1.4 billion in federal tax credits. The Original Bechtel Report stated that the construction was a minimum of two to three years behind its publicly-projected schedule and would not be completed before mid-2022. The Original Bechtel Report also identified a laundry list of problems with the Nuclear Project, including that relevant construction and installation rates "all point to project completion later than the current forecast"; that "plans and schedules are not reflective of actual project circumstances"; that the Company lacked "project management integration needed for a successful project"; and that there was a "lack of shared vision, goals, and accountability" between SCANA and its partners, including "strained" relationships between certain of the entities.

36.     The Original Bechtel Report states that Bechtel representatives "met with

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

SCE&G  CEO [Defendant Marsh]" during the week of October 12-16, 2015. Thus, Defendant Kevin B.  Marsh ("Marsh") and other Defendants were well aware of the critical problems with the Nuclear Project by that time.

37.     SCANA worked furiously with Bechtel to "sanitize" the Original Bechtel Report and  downplay the statements contained therein about grave problems plaguing the Nuclear Project. In order to accomplish that goal, the Defendants hired an attorney to help keep the Betchel report secret and subject to public disclosure.  To  that end, at the Defendants' urging, on February 5, 2016, Bechtel issued an updated version of the Original  Bechtel  Report  (the "Updated  Bechtel  Report"). The  Updated  Bechtel  Report  still  contained  many  of  the Original Bechtel Report's adverse findings about the Nuclear Project's  feasibility, but it no longer expressly stated that completion by 2020 was impossible.

38.     A September 27, 2017 report in *The* State by Cindi Ross Scoppe entitled "How  much  worse  was  the  original  Bechtel  nuclear  report?"  discusses  the  dynamic surrounding the  dueling Bechtel Reports.  The article stated:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel  Assessment Report…Weeks go by with…wrangling over [SCANA's attorney's] rejection of initial report, redactions, timeline removal, critique of project  management."

39.     The Bechtel Reports put every member of SCANA's Board of Directors (the  "Board") on notice that there were insurmountable problems with the Nuclear Project, including  an unrealistic and unachievable schedule; unlikely  completion of engineering and licensing  workload; and poor productivity. The Board knew that these, and other, problems fundamentally  threatened the Nuclear Project.  The Nuclear Project was the subject of much discussion in the SCANA Boardroom.

40.     In or around February 2016, Santee Cooper authored a memorandum (the "Santee Cooper Memo"), which reveals that SCE&G was worried over whether releasing the Updated Bechtel Report would expose SCE&G directors and officers to liability in a "shareholder suit." In this regard, a September 29, 2017 article published in *The State* by Sammy Fretwell and John Monk, entitled "Confidential memo shows SCANA, Santee Cooper long worried over nuclear woes," reported as follows:

> Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Updated Bechtel Report] became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.

41.     The one-page memo – written by an unnamed official of Santee Cooper, SCE&G's junior partner in the project – ***depicts SCE&G as wanting to know if releasing the [Updated] Bechtel [R]eport's contents to stockholders would expose top utility executives and directors to legal liability***.

> "Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting there was concern about how "to defend (a) potential shareholder suit."

42.     The Santee Cooper Memo shows that the Board knew prior to the Bechtel reports and certainly after the Bechtel reports that any failure to act would not comport with their fiduciary responsibilities and misstating or any misrepresentation would be improper and/or unlawful.

43.     After the Bechtel Reports, the Santee Cooper Memo, and additional internal Santee Cooper documents were publicly released, the public was (justifiably) livid. For example, a November 22, 2017 article by Andrew Brown and Thad Moore entitled "Insight that would've alerted problems with nuclear project scrubbed from audit two years ago" in *The*

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

*Post and Courier* quoted Representative Russell Ott, who helped lead a special House committee that investigated the Nuclear Project. Ott stated, "***This is a cover up. This is deception at its core. The bottom line is they lied to everyone and they did it intentionally***." (Emphasis added).

44.    Notwithstanding the Bechtel Reports and the Santee Cooper Memo, Defendants plowed full steam ahead on the hopeless, ill-fated Nuclear Project. Defendants also concealed from regulators the critical adverse information contained in the Bechtel Reports. The Board also misled and allowed SCANA to mislead the public by stating in SCANA-produced promotional videos, press releases, and several SEC filings signed by Defendants, that, *inter alia*, the schedule for the Nuclear Project was on target and the project was entirely viable.

45.    When they could put off the truth no longer, on July 31, 2017, SCE&G and Santee Cooper announced that they would abandon construction of the Nuclear Project, citing rising construction costs. It quickly became clear that this was no innocent business failure; rather, it was radical and indefensible mismanagement.

46.    A sustained media and legal firestorm ensued following this announcement. On August 1, 2017, SCE&G senior management briefed the PSC regarding the project and their decision. Subsequently, SCE&G's management met with various stakeholders and members of the South Carolina General Assembly, including legislative leaders, to discuss the abandonment of the Nuclear Project. In response to concerns of the assembly, and to allow for adequate time for governmental officials to conduct their reviews, SCE&G voluntarily withdrew its petition to abandon the project from the PSC on August 15, 2017.

47.    In August 2017, special committees of the South Carolina General Assembly, both in the House and in the Senate, began conducting public hearings regarding the decision to

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

abandon the Nuclear Project. Members of SCE&G's senior management, along with representatives from Santee Cooper, testified before these committees.

48.     On August 11, 2017, *The Post and Courier* reported that a class action had been filed against SCE&G on behalf of South Carolina SCE&G ratepayers, alleging that SCE&G had overcharged its customers for electricity for nearly 10 years by raising their rates to pay in advance for the construction of the Company's subsequently abandoned nuclear plants.

49.     In September 2017, SCANA was served with a subpoena issued by the United States Attorney's Office for the District of South Carolina seeking documents relating to the Nuclear Project. The subpoena requires the Company to produce a broad range of documents related to the Nuclear Project.

50.     Also in September 2017, the state's Office of Attorney General, the Speaker of the House of Representatives, and the Chair and Vice-Chair of the South Carolina House Utility Ratepayer Protection Committee requested that the State Law Enforcement Division ("SLED") conduct a criminal investigation into the handling of the Nuclear Project by SCANA and SCE&G.

51.     On September 26, 2017, the Office of Regulatory Staff ("ORS") filed a request (the "ORS Request") with the PSC asking for an order directing SCE&G to immediately suspend all revised rates collections from customers which were previously approved by the PSC.

52.     On October 17, 2017, SCANA announced that the SEC had subpoenaed SCANA for documents as part of an investigation into the failed Nuclear Project.

53.     On October 31, 2017, SCANA announced Marsh's resignation as SCANA CEO and Byrne's resignation as Senior Vice President of SCANA and COO and President,

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

Generation and Transmission of SCE&G. SCANA suggested that it still had confidence in Marsh by noting he was not resigning as a SCANA director. But Marsh did exactly that on December 21, 2017.

54.     Defendants breached their fiduciary duties to the Company and to the Plaintiffs and acted in bad faith by, among other things, overseeing, sanctioning, and participating in the grossly mismanaged Nuclear Project; purposefully concealing material information about the Nuclear Project, including the findings of the Bechtel Reports, from regulators and the public, in violation of state and federal law; consciously disregarding the many red flags related to the Nuclear Project's inevitable failure; failing to maintain proper internal controls; improperly and unlawfully enriching themselves and accepting incentive compensation tied to their management of the Nuclear Project.

55.     The South Carolina Public Service Authority (hereinafter "Santee Cooper") and SCANA entered into an agreement wherein both entities would participate in funding of the nuclear power plaint, located in Fairfield County, South Carolina. The Project was scheduled to begin generating power in the year 2020, pursuant to the agreement.

56.     The Defendants sought funds from the Plaintiff and members of the Plaintiff class for the construction of two (2) Westinghouse AP1000 nuclear power plants in Jenkinsville, South Carolina, Fairfield County which is commonly known as the Virgil C. Summer Nuclear Generating Station (hereinafter referred to as the "Project").

57.     However as early as 2008 the Defendants knew their customers and the customers of Santee Cooper were paying for a project that was economically not feasilbe and unnecessary. The Defendants knew their actions would and could affect their own ratepayers but also knew their actions would and could affect the ratepayers of Santee Cooper. With this

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095?

knowledge the Defendants indicated to Santee Cooper that they would not go forward with the project unless the Defendants were the managing parnter for the purpose of the Project and assumed legal and actual control of the Project.

58.     In 2008 Santee Cooper and SCANA (after demanding managerial control) entered into an agreement wherein SCANA would have managing authority and control over the construction and planning processes; and thus not only had fiduciary duties to their own customers, but also assumed and became fiduciary  duties to Santee Cooper and to its customers (Plaintiffs).

59.     This agreement called for Unit 2 of the Project to be completed by April 2016 and Unit 3 to be completed by January 2019 at a combined cost of approximatly $12 billion.

60.     The agreement was an exhibit in a 2008 hearing before the South Carolina Public Service Commision ("PSC"). At this time, the  Defendants knew if the PSC approved this Project then Santee Cooper's customers would be responsible for at least 45% of the Project cost.

61.     During a PSC hearing Marsh also represtned that SCE&G would exercise significant control over the Project. Specifically the PSC found that regardless of the agreement, SCE&G has ultimate responsibility for the proper execution of that contract and the construction of the units, including appropriate qulaity control and quality assurance. Order No. 2009-104(A), entered March 2, 2009.

62.     As a result of the representations made before the PSC, March, Byrne, and Addison along with other SCANA employees were charged with supervision, oversight, and mangement of the Project Santee Cooper customers. The BOD oversaw all aspects of the Project and approved the SCANA mangement team.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095?

63.     As the Project progressed it was continously delayed, had cost increases and setbacks and other major problems.  Depsite knowing this, the Defendants decided to proceed knowing full well that this decision would be at the expense and detriment of the Plaintiffs.

64.     The Defendants and its employees, made misrepresntations, false statements, and misstatements to the PSC and public regarding the health of the Project and the current progress when Defendants knew or should have known that the Project was not progressing as planned. The "rosy picture" was the public posture while knowing that there were significant problems that should have been disclosed and were not.

65.     Early on in the project, the Defendants reluctantly agreed to obtain outside engineering consultants to assess the viability of the Project.  The report of Bechtel was not positive and in spite of the negative report, continued to proceed with the project.  The Defendants attemped to hide this report from the regulators and from the public and even went so far as to attempt to have the report watered down so as not to have such a negative report in the public discussion.  The Defendants failed to accept the recommendations of the Bechtel Corporation and delayed implentation of needed controls to prolong the project in order to benefit themselves.

66.     Upon information and belief, the BOD improperly and unlawfully received significant increases in compensation on top of additional bonuses, with one raise taking effect in mid-2016 by bumping their annual retainer from $26,000 to $213,000 (not including extra fees they can earn by attenidng special meetings and chairing committees).

67.     The BOD, with the knowledge that the project was losing billions of dollars in cost overruns and knowing that the overuns and losses were caused by the Defendants' failure to manage the Project,   continoulsy approved these increases. The BOD approved these

19

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

increases the same month the Bechtel Report was completed. A 130 page audit of the Project which indicated the Project had poor management, faulty design work, flawed building plans, among a variety of other issues.

68.     There was also no member of the Board of Directors that had any experience with nuclear power generation plants and no one who had been involved in the construction of a nuclear power plant.  This lack of experience was one of the factors that was known when the Defendants demanded that they have managerial control over the Project.

69.     Santee Cooper customers (the Plaintiffs) financed approximately $4.7 billion in pre-construction, captial, in-service, construction, interest, and other costs assoacited with the Project and the Defendants reaped substantial funds and wxorbitant profits at the expense of the Plaintiff and the Plaintiffs Class Members.

70.     Profits for the Defendants increased as the costs of the Project increased, creating an incentive for the Defendants to spend indiscriminately.

71.     Despite the numerous setbacks, the Defendants insisted  that Santee Cooper customers would continue to bear costs associated with the Project. The Plaintiffs  never saw any use, service, commondity or benefit from the Project.

72.     On July 31, 2017 the Defendants announced they were abandonig the Project. The Defendants refused to abandon the Project earlier because they received millions of dollars from the Plaintiffs while the project was failing.

73.     The Defendants owed and voluntarily assumed various dutites and obligations to Santee Cooper's direct and indirect customers by demanding and playing a central role in the supervision and management of the Project. The Defendants breached these dutites and obligations thus harming the Plaintiffs. The Defendants' failures include, but are not limited to,

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

failing to:

    a.  Properly oversee and supervise the Project;

    b.  Set and abide by a detailed construction schedule;

    c.  Control and account for construction costs;

    d.  Diligently spend the Plaintiffs monies;

    e.  Protect the Plaintiffs monies by failing to abandon the Project when it was apparent at an earlier stage that the Project was failing;

    f.  Fully inform the PSC, the Plaintiffs, and other ratepayers of the Projects problems and probable demise;

    g.  Use of licensed engineers;

    h.  Misrepresentation of financial matters to the PSC;

    i.  Misrepresentation of problems associated with the Project to the PSC; and

    j.  Improper charging of costs and expenses to the Project.

74.    The Bechtel Reports informed the Defendants that the Nuclear Project was at best radically behind schedule and at worst unrealizable.  Some of the points in the Reports are:

    a.  While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, the plans and schedules are not reflective of actual  project circumstances.

    b.  The Consortium lacks the project management integration needed for a successful  project.

    c.   There is a lack of shared vision, goals, and accountability between the Owners and the Consortium.

    d.  The detailed engineering design is not yet completed which will subsequently  affect the performance of procurement and construction.

    e.  The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation.

    f.  The relationship between the Consortium partners is strained, caused to a large  extent by commercial issues.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

75.     According to an internal Santee Cooper document, SCANA management immediately sought to sanitize the Bechtel Reports, instructing their outside counsel to reject the initial report, and to fight with Bechtel to redact or alter damning portions of it.

76.     Defendants were aware of and likely reviewed (or else recklessly disregarded) the Original Bechtel Report. The Board authorized the Original Bechtel Report and knew it was being completed according to a schedule whereby Bechtel's review would be completed in October 2015, and that Bechtel was expected to present a report in November 2015. Further, the Updated Bechtel Report, which the Board also reviewed, contained a schedule showing that Bechtel had delivered a version of the report to SCANA in November 2015.

77.     As an appendix to both of the Bechtel Reports, Bechtel attached its "weekly reports," which describe the work it did each week from starting its assessment to the drafting of the Original Bechtel Report. Tellingly, the "weekly reports" attached to the Updated Bechtel Report stop at the same point as those attached to the Original Bechtel Report. The Updated Bechtel Report showed that Bechtel had already completed work for its project assessment in October 2015, even though the Updated Bechtel Report was released several months later. In other words, Bechtel performed no additional work after the Original Bechtel Report other than figure out how to water down its earlier conclusions.

78.     Defendants, including in particular the members of the Board's Nuclear Committee, were certainly aware by February 2016 (if not before) that an earlier version of the Bechtel Report had been given to SCANA, and had a clear duty to inquire about and to review that report as well as the February 2016 version.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

**The Updated Bechtel Report**

79.    On February 5, 2016, Bechtel delivered the Updated Bechtel Report to SCANA and  SCE&G.  In that report, which was not made public until September 4, 2017, Bechtel again warned  SCANA and SCE&G of the extensive and "fundamental" problems plaguing the Nuclear Project:

- [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC [engineering procurement and construction] and major project management issues  that must be resolved for project success:

- While the Consortium's engineering, procurement, and construction plans and  schedules are integrated, the plans and schedules are not reflective of actual project  circumstances.

- There is a significant disconnect between construction need dates and procurement  delivery dates.

- The schedule for the startup test program is in the early stages of development.

- The Consortium's project management approach does not provide appropriate  visibility and accuracy to the Owners on project progress and performance.

- The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis.

- There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.

- The Consortium lacks the project management integration needed for a successful  protect outcome.

- The overall morale on the project is low.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The issued design is often not constructible resulting in a significant number of  changes. The construction planning and constructability review efforts are not far  enough out in front of the construction effort to minimize impacts.

- There is significant engineering and licensing workload remaining (currently over  800 engineers) ITAAC closure will be a significant effort.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

- Emergent issues potentially requiring NRC approval of LARs remain a significant project concern.

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program.

- Construction productivity is poor for various reasons including changes needed to the design sustained overtime, complicated work packages, aging workforce etc.

- The indirect to direct craft ratio is high.

- Field non-manual turnover is high.

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.

80.     Thus, even after sanitizing the Original Bechtel Report, the Updated Bechtel Report still plainly showed – and the Board was therefore clearly aware – that the Nuclear Project was in serious jeopardy.

81.     The Santee Cooper Memo states that SCE&G was very concerned over whether it had to reveal the contents of the Bechtel Reports. Indeed, as detailed in an article in *The State* titled "Confidential Memo shows SCANA, Santee Cooper long worried over nuclear woes" on September 29, 2017, the Santee Cooper Memo specifically stated that SCE&G could not now disclaim awareness of, and responsibility for, the myriad problems with the Nuclear Project discussed in the Updated Bechtel Report:

> Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Bechtel Reports] became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.
>
> The one-page memo – written by an unnamed official of Santee Cooper, SCE&G's junior partner in the project – depicts SCE&G as wanting to know if releasing the Bechtel Reports' contents to stockholders would expose top utility executives and directors to legal liability.
>
> ***"Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting***

24

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

*there was concern about how "to defend (a) potential shareholder suit."*

The undated Santee Cooper memo apparently was written around mid-February 2016, within weeks of Santee Cooper and SCE&G officials receiving a report from the Bechtel consulting firm.

82.  Thus, the Santee Cooper Memo shows that the Board was worried about "expos[ing] top executives and directors to legal liability" in a "potential shareholder suit" – precisely what is at issue in this case.

83.  The Santee Cooper Memo also stated that although "SCE&G…was aware the [ORS] was trying to find out about the Bechtel Reports," an SCE&G official "did not answer questions from Santee Cooper about how 'to handle … disclosure' of the report."

84.  Several private communications show that Defendants knew that SCANA's relationship with Westinghouse had deteriorated and that grave financing issues with the Nuclear Project were afoot. For example, on May 1, 2016, SCE&G partner Santee Cooper CEO Lonnie Carter sent a private letter to Jose Gutierrez, the interim President and CEO of Westinghouse: "Unfortunately, our experience with Westinghouse . . . has been set in a trend of continuous deceit and non-transparency."

85.  In June 2016, Marsh sent a private email to Mamoru Hatazawa, Executive Officer of Toshiba Corporation (the parent company of Westinghouse) as follows: "We have no doubt that we have been the victim of financial malfeasance by [Westinghouse] and Toshiba." In another email on June 8, 2016, Marsh informed Mr. Hatazawa that "[w]e continue to be taken aback by what we see as Toshiba's lack of respect" and stated that Toshiba "is not acting honorably."

86.  This correspondence shows that SCANA had fundamental concerns over Westinghouse's ability to fund the Nuclear Project.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

The construction of the New Units and SCE&G's related recovery of financing costs through rates is subject to review and approval by the SCPSC as provided for in the BLRA [Base Load Review Act]. Under the BLRA, the SCPSC has approved, among other things, a milestone schedule and a capital costs estimates schedule for the New Units. This approval constitutes a final and binding determination that the New Units are used and useful for utility purposes, and that the capital costs associated with the New Units are prudent utility costs and expenses and are properly included in rates, so long as the New Units are constructed or are being constructed within the parameters of the approved milestone schedule, including specified schedule contingencies, and the approved capital costs estimates schedule.

87.    On February 26, 2016, SCANA filed its Annual Report on Form 10-K which Marsh signed and Aliff, Bennett, Miller, Cecil, Roquemore, Decker, Sloan, Hagood, Addison, Stowe, Micali, and Trujillo also signed through their attorney in fact, Ronald T. Lindsay. The report stated that "[w]hen the New Units [Nuclear Units 2 and 3 under construction at the V.C. Summer Station] are completed, our generating capacity and the percentage of total generating capacity represented by nuclear sources are expected to increase."

88.    In March 2016, a month after receiving the Updated Bechtel Report, Marsh stated in a letter to shareholders that "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."

89.    On April 28, 2016, SCANA held a conference call [Q1 2016 Earnings Call] with analysts and investors to discuss the Company's first quarter 2016 earnings and operations. During the conference call, SCANA's Chief Nuclear Officer Byrne answered an analyst's question regarding SCE&G's progress in constructing the V.C. Summer reactors. Byrne reassured the analyst that SCE&G's contractors were "doing a tremendous job" and that progress was "better than we expected":

> [**Analyst**]: Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building. And I know that you note in your report that you filed in February, that was mentioned there as well. ***I was***

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

*just wondering if you could update us on the status of that in terms of the components that are being fabricated and so forth.*

**[Byrne]:** *Yes. Dan, the shield building is going probably better than we had anticipated.* Our concern for the shield building really came from the contractor, their concerns, and at the time that was Chicago Bridge and Iron. Now, Fluor has taken over, but we still retained the CB&I services crew that is doing that welding. So, even though CB&I power exited the consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay, *and they're doing a tremendous job. Overall, I'd say the shield building is going a little better than expected.*

90.   On or around June 30, 2016, SCANA issued a "V.C. Summer Nuclear Station Units 2 & 3 Quarterly Report" to the ORS. This report stated that "[w]hile certain aspects of the work present challenges to the completion schedule, overall progress continues."

91.   On July 28, 2016, SCANA held a conference call [Q2 Earnings Call] with analysts and investors to discuss the Company's second quarter 2016 earnings and operations. During the conference call, Byrne discussed the Nuclear Project's schedule with an analyst:

**[Analyst]:** So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones. If you could provide a little bit more of an update there. And ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.

**[Byrne]:** Yes, Julien, this is Steve. *The guaranteed suspension completion dates remain at August of 2019 for Unit 2 and August of 2020 for Unit 3. We don't see anything to change those.* Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and then they will be giving that to Westinghouse. And remember that on the project now, we're just dealing with Westinghouse, Fluor is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. *So I don't expect anything dramatic to come from that.* (**Emphasis added**).

92.   On October 7, 2016, SCE&G "[p]ublished" a video on YouTube of Marsh speaking to reporters on September 21, 2016, at the "V.C. Summer Media Day 2016." In the video, Marsh stated: *"Well they say well if you could do it again, would you make the same*

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095.7

*decision? And absolutely I would make the same decision. I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future."* Marsh further stated that *"with projects of this nature, you're gonna have some challenges . . . but we've been able to meet those challenges, make adjustments. to the contract, and continue progress on the project."* Marsh reiterated:

> *We're excited about where we are, we've had challenges, we've been able to work through those challenges*, because you're not gonna go through a project that's gonna be ten or twelve years without issues come up. I would offer if you've ever built a house, whether it took twelve months or eighteen months, you had a couple issues, you had a couple of change orders along the way, and the likelihood is that didn't reduce the cost of your house as you went through that process.

93.   On October 27, 2016, top SCANA insiders held a conference call [Q3 2016 Earnings Call] with analysts and investors to discuss the Company's third quarter 2016 earnings and operations. During the conference call, Byrne discussed Westinghouse with an analyst:

> **[Analyst]**: Okay. And then I think in your last update report, there was also some discussion about Fluor maybe having some troubles in terms of staffing up for the evening shift or whatever. I wondered if you could update us on that.
>
> [Byrne]: Yes, Fluor, when they first came in, identified the need to increase staffing, and wanted to staff a full back shift or night shift because we'd been operating with a skeleton crew night shift or back shift up to that point. Initially, they had some difficulty in hiring, but I'd say that they recently have rectified that.
> . . . *So they are doing a good job,* they're trying some innovative things, implementing multilingual workforces, those kinds of things. *So we are very happy with what Fluor is doing for us. They've been very successful recently.*

94.   Also on October 27, 2016, SCANA issue a video on YouTube titled "SCE&G Welcomes News Media to Nuclear Construction Site" featuring "members of the V.C. Summer leadership team." In the video, Byrne spoke to reporters on September 21, 2016, at the "V.C.Summer Media Day 2016." Byrne "gave the journalists an overview of the

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

massive construction site before they boarded a bus to see it for themselves." Byrne stated that "[t]he pace of this project is quickening. Though we have run into some issues and roadblocks in the past, most of those issues and roadblocks are behind us."

95.   On February 14, 2017, Toshiba announced that it would delay the release of its quarterly earnings report due to concerns around the company's accounting controls, specifically as they related to its U.S. nuclear subsidiary Westinghouse, which Toshiba estimated would require it to take a $6.3 billion write-down related to the Nuclear Project.

96.   Toshiba's chairman, Shigenori Shiga, announced his resignation to take responsibility for the massive write-down.

97.   Also on February 14, 2017, SCANA issued a quarterly report to the ORS that included "a revised completion schedule" for the Nuclear Project "of April 2020 and December 2020" – later than the previous completion dates of August 2019 and August 2020.

98.   Upon these and other revelations, SCANA's stock price fell approximately 6.25%, or $4.38 per share, from a closing price of $70.03 on February 13, 2017, to a closing price of $65.65 on February 17, 2017.

99.   Despite these announcements which revealed some – but not the full extent – of the troubles affecting SCANA, Westinghouse, Toshiba, and the Nuclear Project, SCANA and the Board continued to make false and misleading statements to the market.

100. On February 16, 2017, SCANA held a conference call [Q4 2016 Earnings Call] with analysts and investors to discuss the Company's first quarter 2017 earnings and operations. During the conference call, Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants":

> We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we*

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380957

*still anticipate completing our two new nuclear units,* which will enable us to provide our customers with safe, reliable energy for decades to come . . . . *As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again, we will continue to monitor this situation closely and will alert you if we are made aware of any changes.*

(Emphasis added).

101. During the same call, Byrne reassured analysts that SCANA would still reach its "2020 deadline" because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us." Specifically, Byrne stated as follows:

**[Byrne]**: . . . When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?

**[Analyst]**: Sorry, yes, the second new unit and the 2020 deadline.

**Byrne**]: *What we've seen so far is that the efficiency factors have increased significantly ... and it's going much, much more smoothly. So I have a reasonable confidence in the efficiency gains for the second new unit.*

\*\*\*

**[Analyst]**: And also, I think in an earlier question you were talking about the various critical path, activities that you have coming up here over the first half of this year and going forward. At what point, how close are you guys to getting to the point where the construction project now becomes a more traditional construction project? And nuclear, in and of itself, is no longer what's the defining factor in terms of getting from here to there?

**[Byrne]**: *I think we're actually pretty close to that. . . . I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.*

102. Between February 28 and March 2, 2017, SCANA attended the 2017 UBS & Morgan Stanley Utilities Conferences, at which the Company published a "2017 UBS & Morgan Stanley Utilities Conferences Presentation" for investors and industry analysts. This

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380957

presentation included the following slide, which graphically showed that SCANA's "Current Position" on the "Manufacturing Schedule" for the V.C. Summer reactors was nearly complete:



103.  On February 24, 2017, SCANA filed its annual report on Form 10-K which was signed by Marsh and signed by Aliff, Bennett, Miller, Cecil, Roquemore, Decker, Sloan, Hagood, Addison, Micali, and Trujillo also signed this report through their attorney in fact, Ronald T. Lindsay. That report stated:

> SCE&G and Santee Cooper have agreed to jointly own, contract the design and construction of, and operate the New Units, which will be two 1,250 MW (1,117 MW, net) nuclear units at SCE&G's Summer Station, in pursuit of which they have committed and are continuing to commit significant resources. *In addition, construction of significant new transmission infrastructure is necessary to support the New Units and is under way as an integral part*

31

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

*of the project. Achieving the intended benefits of any large construction project is subject to many uncertainties.*

104. On March 29, 2017, Westinghouse filed to reorganize its business under the protection of Chapter 11 of the U.S. Bankruptcy Code.

105. On April 12, 2017, Marsh, as well as Byrne, gave an "Ex Parte Briefing" to the PSC concerning Westinghouse's March 29, 2017 bankruptcy filing. During the briefing, Byrne stated that "[s]ince the bankruptcy, Westinghouse has been generally cooperative and responsive to our requests for information"; that "we expect this cooperation to continue"; and that "work continues on-site without substantial disruption."

106. During the briefing to the PSC, Marsh and Byrne presented another slide showing that the "Manufacturing Completion Schedule" for the V.C. Summer reactors was nearing completion:



ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

107. The above statements were false and misleading when made because the Defendants were in position of the Original Bechtel Report in November 2015 and were therefore aware that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020. Defendants further knew of other problems with the Nuclear Project from the Original Bechtel Report, including that relevant construction and installation rates "all point to project completion later than the current forecast"; that "plans and schedules are not reflective of actual project circumstances"; that the Company lacked "project management integration needed for a successful project"; and that there was a "lack of shared vision, goals, and accountability" between SCANA and its partners, including "strained" relationships between certain of the entities.

108. On July 31, 2017, SCANA publicly announced that it would abandon construction of the nuclear project because of delays and cost overruns.

## DUTIES OF SCANA'S BOARD

### A.      The Board's Fiduciary Duties

109. By reason of their positions as directors, officers, and/or fiduciaries of SCANA and because of their ability to control the business and corporate affairs of SCANA, the Board owed and owes the Company and the Plaintiffs fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SCANA in a fair, just, honest, and equitable manner.

110. Each director and officer of the Company owes to SCANA and the Plaintiffs the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

111.  The Board, because of their positions of control and authority as directors and/or officers of SCANA, was able to and did, directly and/or indirectly, exercise control over the  wrongful acts complained of herein.

112.  Because of their directorial and/or executive positions with SCANA, each Board  member had knowledge of material non-public information regarding the Company, including the  Bechtel Reports.   In addition, as directors and/or officers of a publicly held company, the Board had a duty to promptly disseminate accurate and truthful information with regard to the Company's  business.   This is another source of information that Santee Cooper used to judge the actions of SCANA, SCE&G and SCANA Services and because of the false information disseminated to the public and to investor groups, the project continued to lose large sums of money costing the Plaintiffs.

113.  To discharge their duties, the directors and officers of SCANA were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of SCANA were required to, among other things:

a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest  quality performance of their business;

b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules,  regulations and requirements; and

c. When put on notice of problems with, or misstatements about, the Company's business  practices and operations, exercise good faith in taking appropriate action  to correct the misconduct or misstatements and prevent their recurrence.

**B.     To Fulfill Their Fiduciary Duties, the Board and its Committees Had to  Oversee and Monitor the Nuclear Project**

**1.     SCANA's Governance Principles**

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

114. According to the Company's website, SCANA's Board "is charged with the responsibility of overseeing SCANA's business which is conducted by the officers, managers and employees, under the direction of the Chief Executive Officer ("CEO")." Notably, the Board is tasked with "monitoring the performance of the management team to enhance the long-term value of SCANA Corporation for its shareholders.

115. Among the Board's important duties is "review[ing], oversee[ing] and approv[ing] fundamental financial and business strategies and major corporate actions" and "review[ing] and assess[ing] identified significant risks facing SCANA and the alternatives for their mitigation." There was no "business strategy" or "corporate action" more fundamental to SCANA than the strategy relating to the Nuclear Project.

116. As stated in the Company's 2017 Proxy Statement, SCANA's "business and affairs are managed under the direction of [its] Board of Directors. This includes the Board overseeing the types and amounts of risks undertaken." SCANA's 2017 Proxy further represents that all Board members have frequent interactions with the Company's risk officers:

> Also, at each quarterly meeting of the Board of Directors, the Board reviews and discusses a report prepared by the Company's Risk Management Officer and approved by the Risk Management Committee, which sets forth certain high-level risks identified by the Company's senior executive officers and others. The report also provides the current status of such high-level risks, and further identifies where the primary responsibility for risk oversight resides, including both at the Board and Committee level, and identifies the senior executive officer who has primary responsibility for oversight of the particular risk. 2017 Proxy at 18.

117. In addition to those responsibilities, the Board also performs the following functions:

a. approves and maintains a succession plan for the CEO, senior executives, and other senior leaders;

b. reviews the CEO's performance toward accomplishing the objectives of the strategic and business plans; and

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

   c. reviews with the CEO his annual assessment of senior management and other senior leaders.

118.  The Board's committees monitor other specific aspects of SCANA's business. These committees include the Nuclear Oversight Committee, Audit Committee, Compensation Committee, Executive Committee and the Nominating and Governance Committee. These committees either have their own supplemental charters setting forth duties for their respective members in addition to the duties of board members generally, or their committee functions are described in the Company's proxy statements.

119.  The chart below, compiled from SCANA's public filings, illustrates the membership of these committees during all or part of the Relevant Period:

| Director/ Defendant | Audit | Compensation | Executive | Nominating and Governance | Nuclear Oversight |
|---|---|---|---|---|---|
| Aliff | X | | X | X | |
| Bennett | X | X | X | | X |
| Cecil | X | X | | | |
| Decker | | X | | | X |
| Hagood | X | | X | X | X |
| Marsh | | | X | | |
| Miller | X | | | X | |
| Roquemore | | X | X | | X |
| Sloan | | X | X | | X |
| Trujillo | | | | X | X |
| Micali | X | X | X | X | |
| Stowe | X | X | X | X | |

120.  These Board members served during the following times during the Relevant

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

Period:

    a.  Aliff served on three committees --Audit, Executive and Nominating and Governance – from 2016-2017;

    b.  Bennett served on four committees – Audit, Compensation, Executive and Nuclear Oversight – from 2015- 2017;

    c.  Cecil served on two committees – Audit and Executive – from 2015-2017;

    d.  Decker  served on two committees – Compensation and Nuclear  Oversight – from 2016-2017;

    e.  Hagood served on four committees – Audit, Executive, Nominating and Governance and Nuclear Oversight – from 2015-2017;

    f.  Marsh served on one committee – Executive – from 2016-2017;

    g.  Miller served on two  committees – Audit and Nominating  and  Governance – from 2015-2017;

    h.  Roquemore served on three committees – Compensation, Executive and Nuclear Oversight – from 2015-2017;

    i.  Sloan served on three committees – Compensation, Executive and Nuclear Oversight—from 2015-2017;

    j.  Trujillo served on two committees – Nominating and Governance and Nuclear Oversight – from 2015-2017;

    k.  Micali served on four committees – Audit, Compensation, Executive and Nominating and Governance – from 2015-2017; and

    l.  Stowe served on four committees – Audit, Compensation, Executive and Nominating and Governance – in 2015.

121.  In addition, a majority of the Board served on each committee.

### Nuclear Oversight Committee

122.  The  following six directors – a majority of the Board –  served on the  Board's

Nuclear  Oversight  Committee  (the  "Nuclear  Committee"):  Roquemore  (Chair),  Decker,

Hagood,  Sloan,  Trujillo,  and Bennett. According to the 2017 Proxy, the Nuclear  Committee is

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

tasked with "periodically tour[ing] the [Nuclear Project]." The Nuclear Committee  shall "meet at least quarterly to monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics."  2017 Proxy at 17.

123.  Additionally, the Nuclear Committee "reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of our nuclear operations." *Id.* at 17. The Nuclear  Committee also "routinely presents an independent report to the Board on the status of our nuclear operations."  The committee met four times during 2016. *Id.*

### Audit Committee

124. The following seven Board members – a majority of the Board – served on the Board's Audit Committee: Aliff (Chair), Bennett, Cecil, Miller, Hagood,  Micali and Sloan. The 2017 Proxy states that the Audit Committee "reviews the scope and effectiveness of our risk management program which includes the review of quarterly reports pertaining to significant risks" and "reviews major issues regarding accounting principles and financial statement preparation as well as reviews the Company's quarterly and annual financial statements before submission to the Board of Directors for approval and prior to dissemination to our shareholders, the public and regulatory agencies."  2017 Proxy at 14-15.

125. As further described in the Audit Committee Charter[3], the committee shall provide  assistance to the Board with respect to "the integrity of SCANA's financial statements, SCANA's  compliance with legal and regulatory requirements[.]" The Audit Committee is also charged with overseeing "SCANA's systems of disclosure controls and procedures and systems of internal  controls over financial reporting."

126. The Audit Committee is also tasked with reviewing "the appointment, replacement or reassignment of the Internal Auditor or Corporate Compliance Officer and certain

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

other Officer positions as appropriate." SCANA's applicable charter in effect during the Relevant Period specifically provides that the job of the Audit Committee includes, among other things, the following:

- Review the status of significant risk(s) for which oversight is assigned to the Committee by the Board of Directors;

- Discuss SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures;

- Review with the external auditors and Audit Services the adequacy and effectiveness of SCANA's internal controls over financial reporting; and

- Review with any disclosure committee of SCANA the effectiveness of SCANA's disclosure controls and procedures.

127. The 2017 Proxy details the Audit Committee's risk function and oversight of the Company's Risk Management Committee: "The Board has established an executive senior officer- level Risk Management Committee which reports directly to the Audit Committee of the Board…At each quarterly meeting of the Board, the Audit Committee receives a report from the Risk Management Officer. Several members of the Risk Management Committee are also present at the Audit Committee meetings to provide details of the Committee's work and respond to questions raised by Audit Committee members." 2017 Proxy at 18.

### Compensation Committee

128. Seven directors served on the Board's Compensation Committee: Bennett (Chair), Cecil, Decker, Roquemore, Micali, Stowe and Sloan. According to the Compensation Charter, the committee shall "assist the Board in the oversight of matters relating to compensation plans, compensation of SCANA's executives, SCANA's long-term strategic plans and performance in regard to management of human resources."

129. As further described in the Company's 2017 Proxy, the Compensation Committee:

reviews and makes recommendations to the Board with respect to compensation plans, recommends to the Board persons to serve as our senior officers and as senior officers of our subsidiaries, and recommends to the Board salary and compensation levels, including all benefits, for our officers and officers of our subsidiaries. The Committee also approves goals and objectives with respect to the compensation of the Chief Executive Officer, evaluates the Chief Executive Officer's performance and along with the other independent directors sets his compensation based on this evaluation. 2017 Proxy at 15.

130. According to the Compensation Committee Charter[4], the Compensation

Committee is charged with the following duties:

- Recommend to the Board salary and compensation levels, including fringe benefits, for all officers of SCANA and its subsidiaries;

- Review and make recommendations to the Board with respect to all SCANA executive compensation plans, including incentive compensation plans and equity based plans;

- Review SCANA's operating performance relative to the bonus and incentive programs;

- Review and approve corporate goals and objectives with respect to the compensation of the Chief Executive Officer, evaluate the Chief Executive Officer's performance in light of those goals and objectives and, either as a Committee or together with the other independent directors (as directed by the Board), determine and approve the Chief Executive Officer's compensation based on this evaluation;

- Produce an annual report on executive compensation for inclusion in SCANA's proxy statement, in accordance with applicable rules and regulations of the Securities and Exchange Commission;

- Recommend to the Board persons to serve as senior officers of SCANA and its subsidiaries;

- Review SCANA's overall succession and continuity planning with the Chief Executive Officer; and

- Review the level of SCANA stock ownership by SCANA's executive officers to determine whether each executive officer is in compliance with the Company's minimum ownership requirement, and, as may be requested and appropriate, grant temporary waivers from such requirements.

### Nominating and Governance Committee

131. The following six Board members served on the Board's Nominating and

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

Governance Committee: Aliff, Hagood, Miller, Trujillo, Micali and Sloan. The Nominating and Governance Committee Charter states that the committee's purpose is to "identify individuals qualified to become members of the Board and to recommend such individuals to the Board to be Board nominees for directors, as well as to develop and recommend to the Board corporate governance principles, to recommend Board committee membership and responsibilities, and to oversee the evaluation of the Board, its committees and management."

132. SCANA's 2017 Proxy states that the committee "annually reviews the membership and responsibilities of Board committees and recommends to the Board any changes that may be appropriate, and reviews and revises as necessary, SCANA's Governance Principles, taking into account provisions of the Securities Exchange Act of 1934, the listing standards of the New York Stock Exchange and any other source or sources the Committee deems appropriate." 2017 Proxy at 16.

133. The Nominating and Governance Committee is charged with the following duties and responsibilities, among others:

- Evaluate the qualifications and performance of incumbent directors and determine whether to recommend them for re-election to the Board;

- Monitor the orientation and education needs of directors and recommend action to the Board, individual directors and management where appropriate;

- Review the level and form of director compensation and recommend changes to the Board for consideration and approval. In determining compensation for non-employee directors, the Committee shall be guided by the following goals: compensation should fairly pay directors for work required in a company of SCANA's size and scope; compensation should align directors' interests with the long-term interests of shareholders; and the structure of the compensation should be simple, transparent and easy for shareholders to understand;

- Review the status of significant risk(s), if any, for which oversight has been assigned to the Committee by the Board of Directors;

- Evaluate periodically the desirability of, and recommend to the Board, any

41

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380957

changes in the size, composition, organization and operational structure of the Board;

- Review annually membership and responsibilities of Board committees and recommend to the Board any changes that may be appropriate;

- Review annually and revise as necessary, SCANA's Governance Principles, taking into account provisions of the Securities Exchange Act of 1934 (the "Exchange Act"), the listing standards of the New York Stock Exchange…and any other source or sources the Committee deems appropriate; and

- Initiate and oversee annually an evaluation of (i) the quality, sufficiency and timeliness of information furnished by management to the directors in connection with Board and committee meetings and other activities of the directors, (ii) the Board's effectiveness, (iii) the composition, organization (including committee structure, membership and leadership) and practices of the Board, (iv) tenure and other policies related to the directors' service on the Board, and (v) corporate governance matters generally; and recommend action to the Board where appropriate.

**Executive Committee**

134. The following eight Board members – a majority of the Board – served on the Executive Committee: Marsh (Chair), Aliff, Bennett, Hagood, Roquemore, Sloane, Micali, and Stowe. The 2017 Proxy adds that the Executive Committee "exercises the powers of the full Board of Directors when the Board is not in session or cannot be called into session in a timely manner to deal with a time sensitive circumstance, with the exception of certain powers specifically reserved to the full Board of Directors by statute." 2017 Proxy at 16.

135. Further, "the Committee also advises the Chief Executive Officer on other matters important to the Company (due to the size of our Board of Directors, and availability of our Directors to us, the Executive Committee is rarely required to meet)." SCANA's CEO "from time to time sought the advice of the Executive Committee." *Id.* at 16.

**The Company's Code of Conduct and Ethics**

136. SCANA's Code of Conduct and Ethics (the "Code") outlines how SCANA is

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

to "conduct business using the highest ethical standards" as "[i]t is an obligation we have to our customers, our shareholders, our communities and ourselves."[5] In describing the Code, Defendant Marsh states that the Code "mandates that we conduct our business ethically and fairly, following all the rules and regulations that govern us."

137.  The Code states that "[e]xpectations of professional conduct apply to all employees, contractors, Board members or agents of SCANA." The Code also states that Board members must, among other things:

- Behave honestly and avoid illegal, unethical or improper conduct;

- Have a practical working knowledge of the policies, laws and regulations affecting your job responsibilities;

- Report any actual or suspected violation of a law, rule or regulation through your management chain or other available reporting resources. If the concern is related to accounting, internal controls, auditing matters or financial reporting irregularities, contact the Corporate Compliance & Privacy Officer;

- Cooperate with any investigation of alleged wrongdoing; and

- Be aware of the appearance of wrongdoing.

138.  Additionally, members of "SCANA management" must, among other things:

- Be an ethical leader;

- Promptly and properly address situations before they escalate; and

- Ensure systems and procedures are in place to protect Company assets and legally achieve Company goals.

139. Defendants violated the Company's Code of Conduct and Ethics by affirmatively adopting, implementing, and condoning a business strategy based on deliberate and widespread violations of applicable laws.

140.  In breach of their fiduciary duties to SCANA and its shareholders, and in violation

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095?

of South Carolina and federal law, Defendants consciously or recklessly disregarded extensive red flags that made it clear that the Nuclear Project could not be completed on schedule. Yet Defendants caused or allowed SCANA to continue construction and to continue to seek funding increases from South Carolina ratepayers, when they knew or should have known that they were putting SCANA's existence as a going concern on the line.

141. SCANA reported repeated cost-overruns, delays, and design and construction problems. The problems were so significant enough that in or around August 2015, the Board – only after Santee Cooper's insistence – authorized the Company to seek a project assessment by Bechtel to determine whether the Nuclear Project was viable. In November 2015 and February 2016, respectively, Defendants were confronted with the findings in the Bechtel Reports, which made clear that the project could not be completed by 2020 and was in fact unachievable in the promised time frames. In March 2016, the Board of SCANA met with the Board of Santee Cooper to discuss the fact that Westinghouse was at high risk of bankruptcy, threatening the viability of the project.

142. Defendants breached their fiduciary duties by willfully ignoring these unmistakable signs that the Nuclear Project was in fundamental jeopardy. Instead, Defendants doubled down and caused SCANA to seek further budget and rate increases, knowing that their profound failures to oversee and manage the Nuclear Project could destroy the Company and jeopardize SCANA's ability to recover such imprudently incurred costs.

143. Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo had special responsibilities as members of the Nuclear Committee, including to "monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics." Indeed, the Nuclear Committee also "periodically tour[ed] the V.C. Summer

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

Nuclear Station and its training facilities." Thus, these six Defendants' breaches are particularly egregious because they had both special duties and greater access to the truth about the Nuclear Project's problems.

144. Defendants also breached their fiduciary duties by purposefully concealing material information from both regulators and the public about the status of the Nuclear Project for the sole purpose of attempting to avoid liability for themselves, as detailed in the Santee Cooper Memo.

145. Defendants who served on the Nominating and Governance Committee also breached their fiduciary duties to the Company by failing to nominate qualified directors. Specifically, these Defendants failed to nominate any directors who had any experience relevant to overseeing a massive nuclear construction project. This was especially indefensible because the Nuclear Project was critical to the Company.

146. Particularly in light of the practices of SCANA's utility peers, the Nominating and Governance Committee defendants breached their fiduciary duties by failing to nominate even a single director with relevant experience to overseeing a nuclear project.

147. Likewise, Defendants who served on the Compensation Committee also breached their fiduciary duties by approving compensation packages for the Officer Defendants including short-term incentive payments based specifically on purported achievements of goals regarding the Nuclear Project, even though they knew or recklessly disregarded that the project was being seriously mismanaged and was extremely unlikely to be completed.

148. Defendants who served on the Audit Committee also breached their fiduciary duties by failing to exercise their risk management duties with respect to the Nuclear Project and failing to properly exercise their duties as members of that committee as they caused, or

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095T

allowed, SCANA to issue false and misleading statements relating to the Nuclear Project.

149. As a result of Defendants' fiduciary breaches, Plaintiffs have been extensively and irreparably harmed. By directing and/or allowing construction on the Nuclear Project to continue long past the point when it was prudent to do so based on available information, SCANA and the other Defendants have incurred billions of dollars in imprudent expenses while pursuing an unachievable project, and has already seen its ability to pass those expenses on to ratepayers eroded.

150. Defendant Marsh made false and misleading statements to regulators and to the public about the project's status and likelihood of completion. Further, Marsh actively *concealed* crucial information from both regulators and the public, including, *inter alia*, both Bechtel Reports.

151. The Original Bechtel Report states that Marsh met with Bechtel representatives on October 16, 2015 – ***several weeks before the report***.

152. After receiving the Original Bechtel Report, Marsh instructed SCANA's outside counsel to have Bechtel weaken its findings and remove key portions of the report. A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry:

> "Bechtel Assessment Report…[w]eeks go by with…wrangling over [SCANA's attorney's] rejection of initial report, redactions, timeline removal, critique of project management."

153. According to internal Santee Cooper documents, even after receiving the Updated Bechtel Report, Marsh determined not to disclose the report out of fear of shareholder lawsuits and potential personal liability. Marsh was also directly on notice by March 2016 that Westinghouse was at high risk of bankruptcy, threatening the viability of the

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

Nuclear Project.

154. As set forth further above, the Board of Directors were tasked by SCANA's governance principles with monitoring the performance of Company management, as well as "review[ing], oversee[ing] and approv[ing] fundamental financial and business strategies and major corporate actions" and "review[ing] and assess[ing] identified significant risks facing SCANA and the alternatives for their mitigation." The Nuclear Project was clearly a major corporate action and also presented SCANA with significant risks.

155. The Company has repeatedly touted the Nuclear Project as critical to SCE&G's ability to meet growing customer demands for electricity. For example, in the Company's February 12, 2009 investor call for the fourth quarter of 2008, Defendant Addison said: "Our forecast continue[s] to show that we will need the additional generation our new nuclear units will provide in order to support load growth in our system," and Defendant Marsh said that the Company's "request to build the new nuclear plants is a key milestone in our efforts to meet South Carolina's growing need for clean, reliable energy."

156. The Nuclear Project was also a constant focus of the Company's presentations and investor conference calls, and the Company sometimes held separate conference calls solely for the purpose of discussing the Nuclear Project, *e.g.* on August 11, 2014. The Nuclear Project also attracted extensive analyst scrutiny, with multiple analysts asking in-depth questions about the project during each of the Company's quarterly investor conference calls throughout the Relevant Period.

157. The Nuclear Project was so significant to SCANA that SCANA's website had a featured, dedicated page just for the project, including news links, construction videos and construction photos as well as regulatory filings and investor information. Further, the SCANA

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

website's "Investor News" page is divided into three categories: "Nuclear Development," "Investor Releases" and "Other Investor Info." During the Relevant Period, the Company issued over 50 press releases specifically concerning the Nuclear Project.

158. Further, the Nuclear Project had, an enormous financial impact on the Company. When the costs increased, the Defendants profited.

159. As such, the Board of Directors had a clear duty to closely monitor the Nuclear Project and to stay abreast of news concerning its progress and viability. The Board of Directors' fiduciary breaches in light of the Nuclear Project's centrality to the Company's strategy are all the more egregious.

160. Indeed, the Nuclear Project was of such critical importance to the Company that it is inconceivable that the Directors were unaware of news concerning its progress and viability unless they consciously or recklessly ignored such information.

161. Prior to and throughout the construction, the Directors received unmistakable information showing that the Nuclear Project was failing – over 18 months before the project was finally abandoned in July 2017. This included, *inter alia*:

- Rampant cost overruns and delays, many of which were publicly reported in news outlets and which required SCANA to repeatedly seek rate increases and schedule changes from the PSC;
- Concerns expressed by Santee Cooper that an outside construction manager was needed, leading the Board to authorize Bechtel – sometime between April and August 2015 – to do a project assessment;

- The Original Bechtel Report in November 2015;

- The Updated Bechtel Report in February 2016;

- A March 2016 meeting between the Board and the board of Santee Cooper at which the strong possibility of a Westinghouse bankruptcy was discussed;

- Emails from Santee Cooper executives throughout 2016 continuing to urge SCANA to hire an outside construction manager and warning that "SCANA's project management team …. does not have the comprehensive

skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities";

- Morgan Stanley's downgrade of SCANA in June 2016 on concerns about Toshiba and Westinghouse's continued financial viability;

- News reports in major U.S. press outlets at the end of December 2016 that Toshiba had announced that it faced billions of dollars in likely write-downs due to losses stemming from work on the Nuclear Project and one other nuclear project;

- Toshiba's widely reported announcement on February 14, 2017, that it would take a $6 billion write-down related to its nuclear program, and that it might sell Westinghouse, calling into question the continued viability of the Nuclear Project; and

- Westinghouse's filing for bankruptcy in March 2017.

162. The Directors were made aware of these red flags, as all of them had joined the Board by, at latest, October 2015. In spite of these and other red flags, the Directors took no action to mitigate the Company's losses and potential liability from the Nuclear Project.

163. Further, as set forth above, Directors face a substantial likelihood of liability for causing SCANA to issue false and misleading statements.

**The Nuclear Committee**

164. Six Directors – Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo – served on the Nuclear Committee during the Relevant Period, and thus face a substantial likelihood of liability for their special failures as members of that committee. As set forth above, the Nuclear Committee was tasked with "periodically tour[ing] the V.C. Summer Nuclear Station and its training facilities," and with meeting "at least quarterly to monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics." Further, the committee "reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of our nuclear operations," and "routinely

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095T

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

presents an independent report to the Board on the status of our nuclear operations."

> In spite of their special duties with respect to the Company's nuclear operations, none of these six Directors took any action to mitigate or prevent the substantial harm to the Company that has occurred and will continue to occur as a result of the failure of the Nuclear Project. As such, these six directors face a substantial liability for breaches of their fiduciary duties.

### The Nominating and Corporate Governance Committee

165. Four Directors – Aliff, Hagood, Miller, and Trujillo served on the Nominating and Governance Committee during the Relevant Period, and thus face a substantial likelihood of liability for their failure to nominate any directors with nuclear expertise or experience. According to the Nominating and Governance Committee Charter, its purpose includes "identify[ing] individuals qualified to become members of the Board and to recommend[ing] such individuals to the Board to be Board nominees for directors. **The Nominating and Governance Committee took no steps to nominate even *one* director with experience relevant to overseeing a major nuclear project.**

166. Aliff, Hagood, Miller, and Trujillo therefore face a substantial likelihood of liability for their reckless failure to nominate qualified directors, in violation of their fiduciary duties under the Nominating and Governance Committee Charter, SCANA governance principles, and South Carolina law.

### The Compensation Committee

167. Five Directors – Defendants Bennett, Cecil, Decker, Roquemore, and Sloan – served on the Compensation Committee during the Relevant Period. This committee improperly approved millions of dollars in "incentive award" compensation for the Officer Defendants based on purported achievement of "goals" and "strategic objectives," regarding the Nuclear Project when they knew, or had reason to know, that the Nuclear Project was actually failing. As such, these five Demand Directors face a substantial likelihood of liability for

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

breaches  of their fiduciary duties.

## The Audit Committee

168. Five Directors – Directors Aliff, Bennett, Cecil, Hagood, and Miller –  were members of the Audit Committee.  Aliff, Bennett, Cecil, Hagood,  and  Miller  failed  to  fulfill their  risk  management  duties  and  their  duties  to  ensure  that  the  Company's  SEC  filings and  public  statements  were  not  materially  false  or  misleading.  Accordingly,  these  Aliff, Bennett,  Cecil,  Hagood,  and  Miller  face  a  substantial  likelihood  of   liability  for  breaches  of fiduciary duty.

## <u>FOR A FIRST OF ACTION</u>
### (Breach of Fiduciary Duties)

169.  Plaintiffs reallege the above as if stated verbatim and reincorporate all paragraphs into this cause of action.

170.  Each  of  the  Defendants  was  a  member  of  SCANA's  Board  at  relevant  times. As such, each owed SCANA the highest obligations of care and loyalty.

171.  Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to SCANA and its stockholders in at least the following ways:

    a.  Overseeing, endorsing, and participating in  the  gross  mismanagement  of  the Nuclear Project;

    b.  Ignoring  or  consciously  disregarding  the  many  red  flags  related  to  the Nuclear Project's impending failure;

    c.  Deliberately  concealing  material  information  about  the  Nuclear  Project, including the findings of the Bechtel Reports, from regulators and the public,  in violation of state and federal law;

    d.  Failing to maintain proper internal controls;

    e.  Accepting  incentive  compensation  tied  to  their  management  of  the  Nuclear Project, which they were in fact mismanaging and which was failing;

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

f.  wasting corporate assets by continuing to construct the Nuclear Project when they knew or should have known that the Company, rather than South Carolina ratepayers, would wind up responsible for imprudent expenditures;

g.  Making, and allowing SCANA to make, public statements regarding the Nuclear Project that were false and misleading due to the lack of feasibility of its completion, which also resulted in the artificial inflation of the Company's share price;

h.  Allowing for inadequate risk controls over the Company's policies and practices, which allowed the Company to continue with the failing Nuclear Project, regardless of viability and the pervasive problems that existed;

i.  Engaging in abuse of control and gross mismanagement of SCANA's assets and business through a failure to prevent the Nuclear Project;

j.  With respect to the Defendants who served on the Nuclear Committee, grossly failing to adequately exercise their special oversight duties with respect to the unfeasible Nuclear Project;

k.  With respect to the Defendants who served on the Compensation Committee, approving "incentive compensation" paid to the Officer Defendants under false pretenses of successful management of the Nuclear Project;

l.  With respect to the Defendants who served on the Nominating and Corporate Governance Committee, failing to nominate any directors with qualifications relevant to overseeing a nuclear construction project; and

m.  With respect to the Defendants who served on the Audit Committee, failing to fulfill their duties to ensure that SCANA issued accurate statements about the Nuclear Project and to properly fulfill their risk-management duties.

172.  Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to the Plaintiffs to protect its rights and interests.

173.  In breach of their fiduciary duties owed to the Plaintiffs, Defendants willfully participated in misrepresentations related to the progress of the Company's Nuclear Project, risk controls, and internal and disclosure controls, failed to correct the Company's public

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

174. Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the status of the Nuclear Project and they failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of SCANA's securities.

175. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176. Additionally, Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and Ethics, Governance Principles and the charters of various Board committees that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

177. Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

178. Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

179. As a direct and proximate result of Defendants' breaches of their fiduciary obligations, Plaintiffs sustained significant damages. As a result of the misconduct alleged in

this Complaint, Defendants are liable to the Company and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

180. Defendants had actual or constructive knowledge that they had caused the misrepresentation of the status of the Nuclear Project and they failed to correct the Company's public statements. Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of SCANA's securities.

181. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

182. Additionally, Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and Ethics, Governance Principles and the charters of various Board committees that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

183. Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

184. Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

185. As a direct and proximate result of Defendants' breaches of their fiduciary

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380O957

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

obligations, SCANA has sustained and continues to sustain significant damages.  As a result of the  misconduct alleged in this Complaint, Defendants are liable to the Plaintiffs

186. The Board is charged with the responsibility of overseeing the Defendants' business which is conducted by the officers, managers and employees, under the direction of the Chief Executive Officer ("CEO"). The Officers of the Defendants also have the responsibility of acting honestly, fairly and with a fiduciary intent so as to protect the customers of the Company but in this instance, the customers of Santee Cooper.

187.  The Defendants breached their fiduciary duties to the Plaintiffs by, among other things, woefully mismanaging and overseeing the Project as set forth above, charging or allowing charges that were not proper and reporting these charges and costs to the PSC to obtain more funds which improperly enriched the Defendants.

188. The BOD decisions, actions, and inactions were not in good faith, were inconsistent with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and were not in the best interests of Santee Cooper customers.

189.  At all times relevant to this Complaint the Defendants shifted the costs of construction of the nuclear reactor to the Plaintiffs, all while understanding that the reactors would become an asset to be held by and for the benefit of Defendants.

190.  Further, Defendants had a duty to uphold care and loyalty to the Plaintiffs, all those similarly situated, to act in good faith and with due regard to the interests of the Plaintiffs, to properly manage their money, report the status of the Project honestly, and prudently spending the Plaintiffs' monies, protecting the flow of money so as not to pay for costs and expenses that were not proper and conscientiously managing the Project.

191.  Defendants violated and took advantage of this special relationship by

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095̄7

continually mismanaging the nuclear project, misrepresenting the financial condition of the project, and abandoning the project, despite having knowledge for years prior that the Project was failing; all the while requiring Plaintiff and the Class to fund the nuclear project.

192. The Defendants made statements to the Public Service Commission, published information on their websites, issued joint press releases and informed the public, regulators, the PSC, the South Carolina Legislator that the Project was progressing as expected, the Project had massive issues which threatened the completion date, and the Project itself, in the Quarterly Report to the South Carolina Office of Regulatory Staff, Pursuant to PSC Case 2009-104(A) for Quarter ending March 31, 2014, the Defendants made the statement that: "All outstanding BLRA construction milestone completion dates will be updated when this new schedule has been produced, reviewed and approved, in the Quarterly Report to the South Carolina Office of Regulatory Staff, Pursuant to PSC Case 2009-104(A) for Quarter ending June 30, 2014, "The outstanding construction milestone completion dates will be updated when the Revised Fully Integrated Construction Schedule has been produced, reviewed and finalized., and that they were working with Engineers at Bechtel to amend their reports in order to have more favorable findings on the completion date and the status of the Project.

193. Upon information and belief, the Defendants were aware of the issues raised by the Bechtel reports with regard to the delayed completion of the Project until 2020, the significant issues the Project was experiencing.  The Defendants attempted to hide the Bechtel report, have it modified and delayed its release to the public.  They hired an attorney to attempt to claim some special privilege so as not to have to disclose the contents to the public.  While the report of the Bechtel Company was eventually released, the delay in releasing the report caused the public, the S.C. Legislature and the PSC to be further misled and further added to

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957

the cost of the Project.

194. However, in the Quarterly Report to the South Carolina Office of Regulatory Staff, filed in PSC Case number 2009-104(A), on June 30, 2016, the Defendants did not take any steps to make the public, PSC, or other aware of the delayed completion date, the significant issues which the Project was experiencing significant failures.

195. The Defendants reported in the Quarterly Report that the construction of the Project was only "delayed by fourteen months or less compared to the schedule approved by the Commission in Order No. 2015-661."  However, based on information and belief, they knew that the Project would not even be completed by 2020.

196. The Defendants breached their fiduciary duties by actions including but not limited to:

    a.  Allowing the Project to deteriorate in value;

    b.  Failing to use licensed engineers;

    c.  Requesting that reports from Betchel Engineers be changed so no one would be made aware of the delayed schedules, major construction issues and simply failing, or failure of the Project;

    d.  Not setting and following a detailed construction schedule;

    e.  failing to properly spend the Plaintiffs' funds for the construction of the Project;

    f.  allowing the funds to go to waste on the Project when the Defendants, knew, or should have known that the Project was going to cost significantly more than budgeted and was unlikely to be completed;

    g.  Ultimate abandonment of the Project; and

    h.  making false, misleading, statements to the public, the PSC including Plaintiffs.

197. As a result of the breaches of the Defendants' fiduciary duties they caused the Plaintiffs to suffer ACTUAL, CONSEQUENTIAL and PUNITIVE DAMAGES.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

## FOR A SECOND CAUSE OF ACTION
### (Negligence and/or Gross Negligence as to all Defendants)

198.  Plaintiffs reallege the above set forth allegations as if stated verbatim and reincorporate all previous paragraphs into this cause of action and reincorporate all paragraphs into this cause of action.

199.  The Defendants managed the construction of the Project. As such they voluntarily assumed the duties of supervision, oversight, and mangement of the Project to Santee Cooper customers.

200.  Specifically the Defendants breached their duties owed to the Plaintiffs, in one or more of the following ways:

    a.  Ensuring adequate policies and procedures existed regarding construction of the Project and mismanaging the Project;

    b.  In the event such policies or procedures were in place, ensuring compliance with the policies and procedures;

    c.  Ensuring the Project was construed according to industry standards and/or good utility practices;

    d.  Ensuring accurate and transparent representations were made about the Project to members of the public, bondholders, and regulatory entities and in making false and material misrepresentations;

    e.  Ensuring only those costs necessary to the reliable provision of electric service were assessed as to direct and indirect customers; and

    f.  The duty to exercise reasonable oversight and management of the Project;

    g.  The duty to create and enforce appropriate policies and procedures regarding construction of the Project;

    h.  The duty to adequately and accurately apprise Project owners, bondholders, shareholders, regulatory bodies, and members of the public of the status of the Project;

    i.  The duty to exercise due care with regard to decisions made on the Project, including decisions to expand ownership of the Project to third parties;

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095T

j.  The duty not to impose unreasonable or exorbitant costs on financiers of the Project, including the Santee Cooper direct and indirect customers;

k.  The duty to ensure the Project was proceeding according to good utility practices;

l.  The duty to ensure the existence of a Project schedule;

m.  The duty to staff the Project with competent employees knowledgeable in the field of nuclear construction;

n.  The duty to supervise and ensure that monies collected from customers for the Project were not being squandered through poor construction practices or unreasonable activities; and

o.  Such other duties as may be determined during discovery or the trial of this matter.

201.   As a result of the Defendants' conduct as set forth herein, Plaintiffs  lost the beneficial use of two nuclear power Units (2 and 3), and will receive neither the benefit of these units in the future nor the associated benefits of clean, efficient, and cost effective energy, but will continue to incur costs associated with these units despite the loss of their use. Plaintiffs also suffered property damage and loss of use in the form of their money wrongfully being taken to fund the Project.

202. As a direct and proximate result of the Defendants negligent, grossly negligent, and reckless conduct, Plaintiffs have suffered substantial losses and are entitled to recover all actual and consequential damages, including, but not limited to, property damages and loss of use, punitive damages, and such other damages as may be determined in law or equity.

203. As a direct and proximate result of Defendants negligent, grossly negligent, and reckless conduct, Plaintiffs have suffered ACTUAL, CONSEQUENTIAL and PUNITIVE DAMAGES and such other damages as may be determined in law or equity.

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095 7

## FOR A THIRD CAUSE OF ACTION
### (Fraudulent Conduct)

204.  Plaintiffs reallege the above set forth allegations as if stated verbatim and reincorporate all paragraphs into this cause of action.

205.  The Defendants individually named and/or by and through their agents, servants and/or their employees made one or more misrepresentations to Santee Cooper or the PSC. These representations include but are not limited to:

a.  Statements made to the Public Service Commission;

b.  Statements made to the public and/or ratepayers; and

c.  Santee Cooper

206.  The Defendants made numerous statements to the Public Service Commission when seeking approval of the Project and additional funding through testimony and exhibits which was misleading and false.

207. On several occasions, and in particular on August 31, 2016, though a press release, SCANA announced that:

> "Successful placement of the Unit 2 reactor vessel is a very significant milestone on our path to completing the construction of the two new nuclear units," said Kevin Marsh, SCANA chairman and CEO. This accomplishment is representative of the collaboration among many people who are working hard every day to provide a clean and reliable energy future for South Carolina."

208.  The Defendants made statements to the public, to investors, Santee Cooper and to the PSC which included information which lead the ratepayers to believe that:

a.  The Project was economically viability;

b.  The construction was progressing as scheduled;

c.  The budget for the Project was realistic;

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP380095

d.  The approved construction schedule was being followed; and

e.  The approved capital costs estimates were correct.

209.  The Defendants made material false representations that they knew were false. They did so with the intent that others and more particularly Santee Cooper on behalf of the Plaintiffs, would rely on the false statements, and with no knowledge that the representations were false, the recipients (PSC, Public and Santee Cooper) relied on the representations and as a result, the Plaintiffs suffered injury.

210.  The Plaintiffs have been damaged in ACTUAL, CONSEQUENTIAL and PUNITIVE DAMAGES as a result of the fraudulent conduct by the Defendants.

### FOR A FOURTH CAUSE OF ACTION
**(Civil Conspiracy- against all Individual Defendants)**

211.  Plaintiffs reallege the above set forth allegations as if stated verbatim and reincorporate all paragraphs into this cause of action.

212.  The Defendants individually named and by and through their agents, servants and/or employees, conspired for the purpose of depriving, either directly or indirectly, the Plaintiffs' property rights and caused them to be improperly and unlawfully charged with increased rates from Santee Cooper.

213.  The Defendants engaged in a plan, scheme, agreement, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon the Plaintiffs. Such scheme was intended to and did deceive the public, the PSC, Santee Cooper and the Plaintiffs.

214.  As a direct and proximate result of the improper actions of the Defendants, Plaintiffs have been damaged in ACTUAL, CONSEQUENTIAL and PUNITIVE DAMAGES.

215. **WHEREFORE**, Plaintiffs pray judgement against all of the Defendants for **ACTUAL, CONSEQUENTIAL and PUNITIVE DAMAGES,** for attorneys' fees, for the costs of this action and for such further relief this Court may deem just and proper.

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

*s/ J. Edward Bell, III*
J. Edward Bell, Esq. (SC Bar #631)
Gabrielle A. Sulpizio, Esq.
BELL LEGAL GROUP
219 N. Ridge Street
Georgetown, SC 29440
(843) 546-2408 Phone
(843) 546-9604 Fax

ebell@edbelllaw.com

July 18, 2019
Georgetown, South Carolina

ELECTRONICALLY FILED - 2019 Jul 18 2:46 PM - ORANGEBURG - COMMON PLEAS - CASE#2019CP3800957