**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ORANGEBURG DIVISION**

| | |
|---|---|
| **MICHELLE LUQUIRE, ISABELLE JONES AND L.T. WILSON, INDIVIDUALLY AND ON BEHALF OF OTHER SIMILARLY SITUATED PLAINTIFFS** | CIVIL ACTION NO. 5:19-cv-2516-TLW |
| **Plaintiffs,** | **FIRST AMENDED COMPLAINT (CLASS ACTION) (JURY TRIAL REQUESTED) (CLASS CERTIFICATION REQUESTED)** |
| **v.** | |
| **KEVIN MARSH; STEPHEN BYRNE; JIMMY ADDISON; GREGORY E. ALIFF; JAMES A BENNETT; JOHN F.A.V. CECIL; SHARON A. DECKER; LYNNE M. MILLER; JAMES W. ROQUEMORE; ALFREDO TRUJILLO; and MACEO K. SLOAN;** | |
| **Defendants.** | |

NOW COMES, the Plaintiffs Michelle Luquire, Isabelle Jones and L.T. Wilson, individually and on behalf of other similarly situated Plaintiffs, and would respectfully show unto this Court:

## INTRODUCTION

1.      This case involves the decisions, actions, and inactions of Defendants Kevin Marsh, Stephen "Steve" Byrne, Jimmy Addison, Gregory E. Aliff, James A. Bennett, John Cecil, Sharon Decker, Lynne Miller, James Roquemore, Alfredo Trujillo, and Maceo E. Sloan (collectively "Defendants") to undertake a project to construct two nuclear reactors at the V.C. Summer Site in

Jenkinsville, South Carolina ("the Project") at the expense of Plaintiffs, all of whom are customers of South Carolina Public Service Authority ("Santee Cooper").

2.    This case seeks relief against Defendants' for their negligent, grossly negligent, reckless willful and wanton conduct jn the management, funding, operation, and decision making with respect to the Project, all of which resulted in the loss of hundreds of millions of dollars of financing costs paid by Plaintiffs toward the Project.

## JURISDICTION AND VENUE

3.    This case was removed to this Court pursuant to the Class Action Fairness Act. Plaintiffs have not challenged removal.  The basis for jurisdiction is set forth in Dkt. 5:19-cv-2516-TLW, Doc. No. 1, Defendant's Notice of Removal.  Venue is appropriate in the Orangeburg Division as some of the acts or omissions complaint of took place in this division..

## PARTIES

4. Plaintiff, Michelle Luquire, is a resident of Georgetown County and owns property in Georgetown County. Mrs. Luquire purchases her electrical power for her Georgetown County property directly from Santee Cooper. Mrs. Luquire also owns a company which pays for power and electricity from Santee Cooper.

5. Plaintiff, Isabelle Jones, is a resident of Georgetown County and purchases her electrical power for her Georgetown County property from a co-op which purchases the electrical power in bulk from Santee Cooper.

6. Plaintiff, L.T. Wilson, is a resident of Georgetown County and owns property in Georgetown County and owns a business also in Georgetown County.  Both Mr. Wilson's residence and his business purchase electrical power from Santee Cooper.

## CLASS ACTION REPRESENTATION  ALLEGATIONS

7.      Plaintiffs bring this action on their own behalf and on behalf of all persons similarly situated.

8.      The proposed class is initially defined as:

    a.  All account holders, whether individuals and/or entities who paid power bills on any account with Santee Cooper or the Co-ops or municipalities who purchased power from Santee Cooper, which included costs associated with the construction of the Project from inception of the Project to the present date and, including those who have continued to make payments attributed to the Project after the date of this Complaint;

    b.  All account holders, whether individuals and/or entities, who established a new account after the date of this Complaint with Santee Cooper or the Co-ops who purchased power from Santee Cooper, and paid costs associated with the construction of the Project.)s;

9.   Excluded from the Class are:

    c.  SCANA, its legal representatives, elected officials, officers, directors, assigns, and successors;

    d.  SCE&G, its legal representatives, elected officials, officers, directors, assigns, and successors;

    e.  SCANA Services, its legal representatives, elected officials, officers, directors, assigns, and successors;

    f.  The judge, magistrate, and any special master to whom this case is assigned, and any member of their immediate families; and

    g.  To the extent the class certification order permits exclusion, all persons who timely submit proper requests for exclusion from the plaintiff class.

10.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, and as otherwise alleged in this section, the introduction, and the below counts, Defendants have acted or refused to act on grounds generally applicable to all the members of the class.

11.    This Complaint has met all statutory requirements of Rule 23(b)(3) of the Federal

Rules of Civil Procedure for certification:

a. The members of the class are so numerous that joinder of all members is impractical. Although a more precise number of class members will be better established as part of a class notification, upon information and belief, the number of potential members consists of 661,000 residential retail and wholesale customers.

b. Common questions of law and/or facts common to the class predominate including but not limited to:

    i. Whether the Defendants' voluntary undertaking as an agent of Santee Cooper created a fiduciary duty owed to the Plaintiffs;

    ii. Whether the Defendants breached fiduciary duties owed to Plaintiffs when managing the monies for the Project;

    iii. Whether the Defendants were negligent, grossly negligent, and reckless with management and oversight of the Project;

    iv. Whether Defendants' negligent management and oversight of the Project caused damage to the Plaintiffs, and those similarly situated;

    v. Whether the Defendants committed fraud, intentionally misrepresented the facts, or negligently misrepresented the facts concerning the Project to the Public Service Commission, the Plaintiffs, and the public, including facts associated with the Project schedule, completion dates, and budget;

    vi. Whether the SCANA Board of Directors owed statutory and/or fiduciary duties to the Plaintiffs and those similarly situated;

    vii. Whether the Defendants knew or should have known that Plaintiffs and those similarly situated were financing the Project;

    viii. Whether the Defendants knew or should have known that funds paid by Plaintiffs and those similarly situated were being used to support SCANA bonuses, profits, and/or earnings;

    ix. Whether Defendants breached duties to Santee Cooper's direct and indirect customers in failing to provide sufficient supervision and oversight of the Project;

    x. Whether Defendants Marsh, Byrne and/or Addison breached duties owed to Santee Cooper's direct and indirect customers in failing to provide sufficient management and oversight of the Project;

    xi. Whether Defendants Marsh, Byrne and/or Addison made false representations regarding the status of the Project to the PSC, the Plaintiffs, to Santee Cooper and the public;

4

xii. Whether Defendants Marsh, Byrne and/or Addison made false representations regarding the status of the Project in order to support the continued receipt of funds from Plaintiffs;

xiii. Whether, through their false representations to the Public Service Commission, Defendants knew they were committing Plaintiffs' resources to a Project, despite knowledge that the project was off-schedule and over-budget.

c. The claims asserted by the Plaintiffs are typical of the claims of the members of the Class in that their claims involve the same facts as otherwise alleged in this section, the introduction, and the below counts, and arise from the same practices or course of conduct giving rise to the claims of all other class members, and are based on the same legal theories.

d. **The representative parties will fairly and adequately protect the interests of the class. Plaintiffs are adequate representatives of the class because their interests do not conflict with the interest of the members of the class they seek to represent, they adequately and truly represent the interests of the members of the absent members, they have common claims with each class member based on the same essential facts, they have retained counsel competent and experienced in class action and complex class action litigation, and they intend to prosecute this action vigorously.**

e. Plaintiffs satisfy Rule 23(b)(3) of the Federal Rules of Civil Procedure as the class action device satisfies the predominance and superiority requirements. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – where individual class members lack the financial resources to vigorously prosecute a lawsuit against individual and corporate Defendants. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender. The adjudication of individual litigation claims **would result in a great expenditure of Court and public resources; however, treating the claims as a class action would result in a significant saving of these costs. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and/or varying adjudications with respect to the individual Class Members, establishing incompatible standards of conduct for Defendants and resulting in impairment of the Class Members' rights and the disposition of their interests through actions to which they were not parties.**

f. **This class shall exclude (a) all attorneys and their staff representing the putative class, (b) all members of the judiciary presiding over this case, and (c) the Defendants, including all Defendants' agents, officers, and directors.**

## DEFENDANTS

12.    Defendant Kevin Marsh ("Marsh") served as Chairman of the Board, President, and Chief Executive Officer ("CEO") of SCANA from December 2011 until October 2017 and as a SCANA director from 2011 to December 21, 2017. Marsh was also the Chairman of the Board's Executive Committee at relevant times. As stated in the Company's public filings with the SEC, for 2015 and 2016,  Marsh received total compensation of $5,733,258 and $6,108,804, respectively. Upon information  and belief, Marsh is a citizen of South Carolina.

13.    Defendant Stephen A. Byrne ("Byrne") has served as an Executive Vice President of SCANA, as well as President of Generation and Transmission and Chief Operating Officer of SCE&G. As stated in the Company's 2017 Proxy Statement filed on Form DEF 14A with the SEC on March 24, 2017 (the "2017 Proxy"), Byrne's "nuclear responsibilities include overseeing the construction of [the Nuclear Project]." 2017 Proxy at 28. According to the Company's  public filings, for 2015 and 2016, Byrne received total compensation of $2,314,038 and $2,582,141, respectively.  Upon information and belief, Byrne is a citizen of South Carolina.

14.    Defendant Jimmy Addison ("Addison") was appointed Executive Vice President of SCANA in January 2012, and has a l s o  served as the Company's CFO and CEO. According to the Company's public filings, for 2015 and 2016, Addison received total compensation of $2,405,419 and $2,580,874, respectively. Upon information and belief, Addison is a citizen of South Carolina.

15.    Defendant Gregory E. Aliff ("Aliff") has served as a director of the Company since October 2015. Aliff has served as the Chairman of SCANA's Audit Committee and as a member of the Company's Executive and Nominating and Governance Committees. According to the

Company's public filings, for 2015 and 2016, Aliff received total compensation of $48,250 and $213,500, respectively. Upon information and belief, Aliff is a citizen of Virginia.

16.     Defendant James A. Bennett ("Bennett") has served as a director of the Company since 1997.    Bennett serves as the Chairman of the Company's Compensation Committee and is a member of the Company's Executive and Audit Committees.  Bennett  was a member of the Nuclear Committee. According to the Company's public filings, for 2015  and 2016, Bennett received total compensation of $194,157 and $215,867 respectively. Upon  information and belief, Bennett is a citizen of South Carolina.

17.     Defendant John F.A.V. Cecil ("Cecil") has served as a director of the Company since 2013.  Cecil has served on the Company's Audit and  Compensation Committees. According to the Company's public filings, for 2015    and  2016, Cecil received total compensation of $193,000 and $206,000, respectively.  Upon information  and belief, Cecil is a citizen of North Carolina.

18.     Defendant Sharon A. Decker ("Decker") has served as a director of the Company since October 2015.  Decker previously served as a director of the Company from 2005 until April 2013. Decker has served on the Company's Compensation and  Nuclear Committees. According to the Company's public filings, for 2015 and 2016, Decker  received total compensation of $48,250 and $206,000, respectively.  Upon information and belief,  Decker is a citizen of North Carolina.

19.     Defendant Lynne M. Miller ("Miller") has served as a director of the Company since 1997.  During  the Relevant Period, Miller has served on the Company's Audit and Nominating and Governance Committees. According to the Company's public filings, for 2015

and 2016, Miller received total compensation of $197,000 and $206,000, respectively. Upon information and belief, Miller is a citizen of Virginia.

20.     Defendant James W. Roquemore ("Roquemore") has served as a director of the Company since 2007. Roquemore served as the Chairman of the Company's Nuclear Committee and on SCANA's Executive and Compensation Committees. According to the Company's public filings, for 2015 and 2016, Roquemore received total compensation of $197,000 and $216,000, respectively. Upon information and belief, Roquemore is a citizen of South Carolina.

21.     Defendant Maceo K. Sloan ("Sloan") has served as a director of the Company since 1997. Sloan has served on the Company's Nuclear Oversight and Compensation Committees, including as Chairman of the Compensation Committee, and as a member of SCANA's Executive Committee. According to the Company's public filings, for 2015 and 2016, Sloan received total compensation of $201,000 and $210,000, respectively. Upon information and belief, Sloan is a citizen of North Carolina.

22.     Defendant Alfredo Trujillo ("Trujillo") has served as a director of the Company since 2013. Trujillo has served on the Company's Nuclear Oversight and Nominating and Governance Committees. According to the Company's public filings, for 2015 and 2016, Trujillo total compensation of $193,000 and 206,000, respectively. Upon information and belief, Trujillo is a citizen of Georgia.

23.     Defendant James M. Micali ("Micali") served as a director of the Company from 2007 until the 2017 Annual Meeting, when he retired as a result of his reaching mandatory retirement age. During part of the Relevant Period, Micali served as a member of the Audit, Compensation and Executive Committees and served as Chairman of the Nominating and Governance Committee. According to the Company's public filings, for 2015 and 2016, Micali

received total compensation of $201,000 and 215,000, respectively. Upon information and belief, Micali is a citizen of Massachusetts.

24.    Defendant Harold C. Stowe ("Stowe") served as a director of the Company from 1999 until the 2016 Annual Meeting, as a result of his reaching mandatory retirement age. Stowe served as Lead Director and as a member of the Audit, Compensation, Executive, and Nominating and Governance Committee. According to the Company's public filings, for 2015 and 2016 Stowe received total compensation of $211,245 and $106,105 respectively. Upon information and belief, Stowe is a citizen of South Carolina.

25.    As set forth herein, at all times relevant to this Complaint, the Board of Directors ("BOD") of SCANA/SCE&G possessed the power and authority to control decisions related to the Project's oversight, management and construction, contents of SCANA's SEC filings, public disclosures, including disclosures to the South Carolina Office of Regulatory Staff ("ORS") and the South Carolina Public Service Commission ("PSC"), press releases, and other marketing communications. Because of their positions with the Company, and their access to material information, the Defendants knew that many of the adverse facts specified herein and others had not been disclosed, and were being actively concealed from the public, and that the public and positive representations being made to third parties were materially false and misleading.

26.    Accordingly, Defendants are liable for the false statements, fraud, and omissions pleaded herein.

27.    At all times relevant to this Complaint, the Defendants were also fiduciaries to the Plaintiffs after demanding and accepting "control" and management of the Project from Santee Cooper, and knew that they had assumed a fiduciary relationship to all those impacted by their decisions with respect to the project, including Plaintiffs. As a result of assuming this special

relationship with Santee Cooper ratepayers, Defendants were responsible for their actions which were not fair, reasonable and honest.

## FACTUAL BACKGROUND

### I.     NATURE OF THE ACTION

28.     This is a claim for damages against the Defendants stemming from Defendants' egregious breaches of fiduciary duties, misrepresentations, failure to correct known public misstatements, and Defendants' negligent, grossly negligent and reckless conduct in managing, operating, and overseeing the Project, along with their eventual decision to abandon the Project.

29.     At all times relevant to this Complaint, Defendants Aliff, Bennett, Cecil, Decker, Miller, Roquemore, Trujillo and Sloan composed the SCANA Board of Directors ("BOD") and were appointed to various committees within SCANA including the finance and compensation committees.

30.     As part of their role with SCANA, the BOD was apprised of the circumstances of the Project by various SCANA personnel, including Defendants Addison, Byrne and Marsh, and made financial decisions with respect to the Project including the compensation structure for Addison, Byrne, and Marsh, and on what basis each of the individual Officers would receive bonuses when tied to the Project.

31.     As a result of Defendants' conduct, acts, inactions, omissions, and decisions Plaintiffs have been forced to pay extra charges for a construction project that was persistently off schedule, over budget, and plagued by design issues and delay.

32.     At all times relevant to this Complaint, SCANA was an energy-based holding company whose principal subsidiary, South Carolina Electric & Gas Company ("SCE&G"),

was a regulated public utility engaged in the generation, transmission, distribution and sale of electricity primarily in South Carolina.

33.     In 2006, SCANA and its partner in the Project, Santee Cooper, successfully lobbied the South Carolina legislature to pass new legislation that would allow Santee Cooper to partner with one or more utilities to construct two new nuclear reactors at the V.C. Summer site in Jenkinsville.. *See* S.C. Code § 58-31-200, *et seq.*

34.     Thereafter, in 2007, South Carolina passed the Base Load Review Act ("BLRA"), which enabled SCE&G and other investor owned utilities to pass power plant capital financing costs onto customers.

35.     South Carolina was one of only three states that passed cost shifting legislation.

36.     Given SCE&G's use of cost shifting to facilitate its portion of the payments associated with the Project, SCE&G and its respective Officers and Directors knew or should have known that its similarly situated partner, Santee Cooper, whose financial position was no better than that of SCE&G, would also impose cost shifting upon its customers to cover Project financing costs.

37.     In 2008, SCANA, with the knowledge and consent of Santee Cooper, filed its initial Combined Application and Certificate of Need for a Baseload Review Order to undertake construction of the Project. *See* PSC Dkt. 2008-196-E.

38. In connection with proceedings before the PSC, and at all times relevant to this Complaint, SCANA acted for itself and as the agent of Santee Cooper. The involvement of Santee Cooper in the Nuclear Reactor Project was indispensable to SCANA's Base Load Application and the joint ownership was touted as a significant benefit to the Nuclear Reactor

11

Project. Pursuant to agreements by and between SCANA and Santee Cooper, every action undertaken by SCANA was taken on behalf of itself and as the agent of Santee Cooper.

39. In its application, SCANA asserted that the first reactor would be on-line and generating power in 2016, and the second by 2017. The total projected cost at the time was $9.8 billion. As of the initial application, SCANA acknowledged and understood that "the fact that 45% of the electricity generated by Units 2 and 3 will be generated for the benefit of cooperative customers in South Carolina is a significant factor in [the PSC] decision." PSC. Order No. 2009-104, p. 87. In addition, Defendants were aware that the PSC Order found, "regardless of the terms of the EPC Contract, SCE&G has the ultimate responsibility for the proper execution of that contract and the construction of the Units, including appropriate quality control and quality assurance." Id., p 78.

40. After repeated delays and issues associated with module fabrication and assembly, and changes to the design and requirements of the initial license application, the NRC issued a Certificate of Licensure for the Project on March 28, 2012, roughly one year behind the initial schedule.

41. Nuclear construction on the Project did not begin until 2013. By this time, Defendants were aware that Plaintiffs had been funneling money into the Project for approximately 8 years. SCANA's lead contractor on the Project was Westinghouse Electric Company ("Westinghouse").

42. In addition, Defendants Marsh, Byrne, and Addison were all part of SCE&G's New Nuclear Deployment force, an internal SCE&G team with specific duties and responsibilities associated with Project, who also received compensation and bonuses tied to the Project. Defendants passed the costs associated with NND onto Plaintiffs.

43.     Despite committing a number of personnel to work on the Project, Defendants had limited to no new nuclear construction experience. Instead, Defendants' experience was limited to operating an existing plant, including corresponding shut-downs and routine maintenance and repairs. Accordingly, Defendants had no experience in administering and overseeing the execution of an EPC contract.

44. During its pendency, and with Defendants' full knowledge, the Project experienced significant labor and construction delays and runaway costs. Defendants received extensive warnings about these problems beginning early in the Project's but did little to remedy the situation. Indeed, Defendants' primary contractor Westinghouse repeatedly promised to deliver a resource loaded schedule, but failed to execute on its promise.

45. In addition, despite representations by Westinghouse that the design was substantially complete on the Project prior to its commencement, in fact major aspects of the design remained incomplete on the Project, even up until abandonment. The absence of a complete design made procurement and commodities impossible. Yet throughout the Project, Defendants passed along huge amounts of commodities costs onto Plaintiffs.

46.     As issues worsened, SCANA's partner on the Project, Santee Cooper, pressured SCANA to hire construction firm Bechtel to perform an in-depth assessment of the viability of the Nuclear Project.

47.     Initially, Defendants Marsh, Byrne, and Addison resisted hiring Bechtel. However, In August 2015, the full SCANA Board and Defendants herein, approved a proposal to retain Bechtel to assess the Project. Defendants passed the costs of Bechtel onto Plaintiffs.

48.     Defendants decided not to publicly disclose the fact that Bechtel had been retained, however. A SCANA Board Member noted in an e-mail that SCANA executives were

in "complete agreement that no disclosure should be made."

**The Original Betchel Report**

49.     Bechtel presented its initial findings to SCANA in October 2015 and issued its first report (the "Original Bechtel Report") on November 9, 2015. The Original Bechtel Report made clear that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020 – a crucial deadline for SCANA to be eligible for nearly $2 billion in federal tax credits, a percentage of which SCANA had promised to Santee Cooper.

50. The Original Bechtel Report concluded that construction was a minimum of two to three years behind the publicly-projected schedule and would not be completed before mid-2022. The Original Bechtel Report also identified a laundry list of problems with the Nuclear Project, including that relevant construction and installation rates "all point to project completion later than the current forecast"; that "plans and schedules are not reflective of actual project circumstances"; and that the design was not constructible.

51.     The Original Bechtel Report also found that the Company lacked "project management integration needed for a successful project"; and that there was a "lack of shared vision, goals, and accountability" between SCANA and its partners, including "strained" relationships between certain of the entities.

52.     Finally, the Original Bechtel Report determined that the internal SCE&G management charged with oversight on the Project lacked the appropriate experience to competently execute the oversight role. The Original Bechtel Report stated that Bechtel representatives "met with SCE&G CEO [Defendant Marsh]" during the week of October 12-16, 2015, thus notifying Defendant Marsh of the report's conclusions.

53. After initially meeting with Bechtel, Defendants indicated to SCANA's Project partner

Santee Cooper that SCANA wanted the schedule piece of the report removed, and also wanted the criticisms of SCANA Project management softened.

54.     SCANA worked furiously to "sanitize" the Original Bechtel Report and downplay the Report's statements about SCANA's performance on the Project. In order to conceal the Original Report from public dissemination, Defendants hired an attorney to facilitate scrubbing portions of the Report that referenced schedule and management incompetency.

55.     After several months of scrubbing, on February 5, 2016, Bechtel issued an updated version of the Original Bechtel Report (the "Updated Bechtel Report"). The Updated Bechtel Report still contained many of the Original Bechtel Report's adverse findings about the Project's feasibility, but omitted any reference to a delayed substantial completion date.

56.     A September 27, 2017 report in *The State* by Cindi Ross Scoppe entitled "How much worse was the original Bechtel nuclear report?" discusses the dynamic surrounding the dueling Bechtel Reports. The article stated:

> A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry: "Bechtel Assessment Report…Weeks go by with…wrangling over [SCANA's attorney's] rejection of initial report, redactions, timeline removal, critique of project management."

57.     The Bechtel Reports put into sharp relief what every member of SCANA's Board of Directors (the "Board") already knew: that the Project had been plagued for years by issues including design delays and redesigns, voluminous work packages, fabrication issues, craft labor issues, improper indirect to direct craft rations, the absence of quality assurance and quality control, an unrealistic and unachievable schedule; poor productivity, and, critically, inexperienced and incapable management. The Board knew that these, and other, problems fundamentally threatened the Nuclear Project. .

15

58.     In or around February 2016, Santee Cooper authored a memorandum (the "Santee Cooper Memo"), which revealed that SCANA was discouraging the release of the Updated Bechtel Report. According to the memo, SCANA and its directors and officers feared release of the report might expose the utility to liability in a "shareholder suit." In this regard, a September 29, 2017 article published in *The State* by Sammy Fretwell and John Monk, entitled "Confidential memo shows SCANA, Santee Cooper long worried over nuclear woes," reported as follows:

> Some 20 months before a report critical of the failing V.C. Summer nuclear project [the Updated Bechtel Report] became public, SCE&G was worried how much – if anything – it should tell bond buyers, stockholders and state regulators about the contents of that report, according to a memo obtained by The State newspaper.

59.     The one-page memo – written by an unnamed official of Santee Cooper,– provides in pertinent part:

> "Now that SCE&G is specifically aware of problems raised in (the) report, failure to act may result in O&D (officers and directors) liability," the memo says, noting there was concern about how "to defend (a) potential shareholder suit."

60.     Yet during the same time that Defendants scrubbed and ultimately withheld the Bechtel report from the Public, Defendants Marsh, Byrne and Addison received significant compensation, including bonuses associated with performance outcomes on the Project.

61.     The SCANA Board voted on and authorized the compensation issued to Defendants Marsh, Byrne, and Addison during the 2015 and 2016 timeframe, as well as during the entire pendency of the Project.

62.     The financial compensation for Defendants Marsh, Byrne, and Addison, which the SCANA Board authorized, was paid in part by Plaintiffs.

63.     On March 29, 2017, Westinghouse announced they were seeking bankruptcy protection.

64.     Yet the Project continued for a further four months, and cost over $100 million per

month during that timeframe.

65.    Defendants passed these costs along to Plaintiffs.

66.    On July 31, 2017, SCE&G and Santee Cooper announced that they would abandon construction of the Nuclear Project, citing rising construction costs. It quickly became clear that this was no innocent business failure, nor was the information forming the basis of the abandonment unforeseeable or unknowable; rather, it was radical and indefensible mismanagement.

67.    A sustained media and legal firestorm ensued following the abandonment announcement. On August 1, 2017, SCE&G senior management, including Defendants Marsh, Byrne, and Addison, briefed the PSC regarding the project and the abandonment decision..

68.    In August 2017, special committees of the South Carolina General Assembly, both in the House and in the Senate, began conducting public hearings regarding the decision to abandon the Project. Members of SCE&G's senior management, including Defendants Marsh, Byrne, and Addison, along with representatives from Santee Cooper, testified before these committees.

69.    On October 31, 2017, SCANA announced Marsh's resignation as SCANA CEO and Byrne's resignation as Senior Vice President of SCANA and COO and President, Generation and Transmission of SCE&G. SCANA suggested that it still had confidence in Marsh by noting he was not resigning as a SCANA director. But Marsh did exactly that on December 21, 2017.

70.    Defendants breached their fiduciary duties to the Plaintiffs and acted in bad faith by, among other things, failing to oversee, authorizing, sanctioning, and participating in the grossly mismanaged Project; purposefully concealing material information about the Project, including the findings of the Bechtel Reports, from regulators and the public, in violation of state and federal law; consciously disregarding the many red flags related to the Project's inevitable

failure; failing to maintain proper internal controls; improperly and unlawfully enriching themselves and accepting incentive compensation tied to their management of the Project.

71.     At all times relevant to this Complaint, Defendants were responsible for overseeing and assessing the Owners' budget associated with the Project.

72.     The Defendants sought funds from the Plaintiff and members of the Plaintiff class for the Project. Defendants did this by submitting bills to Santee Cooper, knowing Plaintiffs would be assessed the associated costs.

73.     However as early as 2008 Defendants knew the Project was economically infeasible and unnecessary. At all times relevant to the Project, and pursuant to the Agreements, and understanding of Defendants and Santee Cooper, as joint owners of the Project, Defendants understood that every decision they made with respect to the project had a corollary impact on Plaintiffs.

74.     In 2008 Santee Cooper and SCANA (after demanding managerial control) entered into an agreement wherein SCANA would have managing authority and control over the construction and planning processes; and thus not only had fiduciary duties to their own customers, but also assumed fudiciary obligations toward Santee and the Plaintiffs.

75.     Throughout the Project, and as a result of representations made before the PSC, and as evidenced by various Bridge Agreements, Permanent Agreements, and the EPC, Defendants March, Byrne, and Addison along with other SCANA employees were charged with supervision, oversight, and mangement of the Project. Defendants, acting in their capacity as a Board of Directors, oversaw and approved all aspects of the Project.

76.     The Defendants routinely and repeatedly made misrepresntations, false statements, and misstatements to the PSC and the public regarding the health of the Project and

its current progress, all while Defendants knew or should have known that the Project was not progressing on schedule, and was likely incapable of being completed on time.

77.    Upon information and belief, the BOD improperly and unlawfully received significant increases in compensation on top of additional bonuses. One such raise, which took effect  in mid-2016, increased the Board's annual retainer from $26,000 to $213,000 (not including extra fees they could earn by attending special meetings and chairing committees).

78.    The BOD, with the knowledge that the project was losing billions of dollars in cost overruns and knowing that the overuns and losses were caused in part by the Defendants' failure to manage the Project,  nevertheless continued to  approve cost increases associated with the Project.

79.    For example, despite knowledge that SCANA's partner Santee was adamant about hiring a third party to perform an assessment of the Project, in March of 2015, the BOD and individual Defendants Addison, Byrne, and Marsh nevertheless authorized SCANA to increase the budget associated with the Project by over $500 million. Defendants knew that the costs of this budget increase would be paid by Plaintiffs.

80.    At all times relevant to this Complaint, no member of the BOD had any experience in new nuclear construction, nor did the individual Defendants Addison, Byrne and Marsh have any experience with new nuclear construction. Rather, Defendant Byrne had experience with existing nuclear power plants, and Defendants Addison and Marsh had backgrounds in accounting. Nevertheless, the BOD authorized Defendants Addison, Byrne and Marsh to assume leadership roles on the Project, and to be compensated for these roles.

81.    Santee Cooper customers (the Plaintiffs) financed approximatly $4.7 billion in pre-construction, captial, in-service, construction, interest, and other costs assoacited with the

Project and the Defendants reaped substantial funds and exorbitant profits at the expense of the Plaintiff and the Plaintiffs Class Members.

82.     Profits for the Defendants increased as the costs of the Project increased, creating an incentive for the Defendants to spend indiscriminately.

83.     Despite the numerous setbacks, the Defendants insisted  that Santee Cooper customers would continue to bear costs associated with the Project. In fact, Defendants blocked efforts by Santee Cooper to bring in another utility to help manage and spread the costs associated with the Project, even when Defendants knew or should have known that Santee Cooper did not need the added generation the Project represented, nor were the costs associated with the Project economical for Santee Cooper.

84.     Defendants failed to cooperate with efforts to provide information to prospective purchasers of a percentage of Santee Cooper's interest, including but not limited to prospective third party purchaser Duke Energy.

85.     Defendants efforts to impede the sale of a percentage of Santee Cooper's ownership interest resulted in Plaintiffs bearing the entirety of the Santee Cooper financing costs, instead of a lesser portion.

86.     In addition, in or around 2014, Santee Cooper agreed to sell a small portion of its ownership interest to SCANA. According to the terms of the Agreement between the Owners, Plaintiffs would continue to finance the entire portion of Santee's ownership interest until the Project was online. To agree to the purchase, Defendants required Santee Cooper to promise not to continue efforts to sell a more substantial portion of the Project while construction was ongoing.

87.     Thus, not only did Defendants receive compensation during the interim of

SCANA's efforts to inhibit the sale of Santee Cooper's ownership in the Project, but after January, 2014, Plaintiffs were providing the financing for a portion of the Project that would never benefit Plaintiffs in the future.

88.    Plaintiffs never saw any use, service, commondity or benefit from the Project.

89.    The Defendants owed and voluntarily assumed various dutites and obligations to Santee Cooper's direct and indirect customers by demanding and playing a central role in the supervision and management of the Project, and authorizing financing and compensation associated with the Project, which Defendants knew or should have known would be borne by Plaintiffs. The Defendants breached these dutites and obligations thus harming the Plaintiffs. The Defendants' failures include, but are not limited to, failing to:

     a.  Properly oversee and supervise the Project;

     b.  Set and abide by a detailed construction schedule;

     c.  Control and account for construction costs;

     d.  Diligently spend the Plaintiffs monies;

     e.  Protect the Plaintiffs monies by failing to abandon the Project when it was apparent at an earlier stage that the Project was failing;

     f.  Fully inform the PSC, the Plaintiffs, and others of the Project's problems and probable demise;

     g.  Use licensed engineers;

     h.  Accurately represent financial matters to the PSC;

     i.  Accurately represent problems associated with the Project to the PSC, the public, and in regulatory filings;

     j.  Charge proper costs and expenses to the Project; and

k. Authorizing budgets and compensation associated with the Project that were not

supported by actual project conditions.

74. As of the dates of the Bechtel Reports, Defendants could not longer ignore that the

Project was at best radically behind schedule and at worst unrealizable.

75. In fact, in his testimony before the PSC in the hearing on the Nuclear Dockets,

indepenent expert from the ORS, Gary Jones verified that though the Bechtel Reports were not

disclosed by SCANA, the information contained in the Reports was well known to the Owners.

*See* Dkt. No. 2017-305-E, Direct Testimony of Gary Jones; Deposition of Gary Jones, *Lightsey v.*

*SCE&G, et al*, 2017-CP-25-00335.

76. Some of the pertinent points in the Reports are:

a. While the Consortium's engineering, procurement, and construction (EPC) plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

b. The Consortium lacks the project management integration needed for a successful project.

c. There is a lack of shared vision, goals, and accountability between the Owners and the Consortium.

d. The detailed engineering design is not yet completed which will subsequently affect the performance of procurement and construction.

e. The oversight approach taken by the Owners does not allow for real-time, appropriate cost and schedule mitigation.

f. The relationship between the Consortium partners is strained, caused to a large extent by commercial issues.

75. As an appendix to both of the Bechtel Reports, Bechtel attached its "weekly

reports," which describe the work it did each week from starting its assessment to the drafting of

the Original Bechtel Report. Tellingly, the "weekly reports" attached to the Updated Bechtel

Report stop at the same point as those attached to the Original Bechtel Report. The Updated

Bechtel Report showed that Bechtel had already completed work for its project assessment in October 2015, even though the Updated Bechtel Report was released several months later. In other words, Bechtel performed no additional work after the Original Bechtel Report other than figure out how to water down its earlier conclusions.

76.     The Reports indicate that members of SCANA Personnel, including some or all of the individual Defendants, were interviewed during the process of Bechtel's audit.

77.     Thus Defendants, including in particular the members of the Board's Nuclear Committee, were certainly aware by February 2016 (if not before) that an earlier version of the Bechtel Report had been given to SCANA, and had a clear duty to inquire about and to review that report as well as the February 2016 version.

**The Updated Bechtel Report**

78.     On February 5, 2016, Bechtel delivered the Updated Bechtel Report to SCANA and SCE&G. In that report, which was not made public until September 4, 2017, Bechtel again warned SCANA and SCE&G of the extensive and "fundamental" problems plaguing the Nuclear Project:

- [T]he V.C. Summer Units 2 & 3 project suffers from various fundamental EPC [engineering procurement and construction] and major project management issues that must be resolved for project success:

- While the Consortium's engineering, procurement, and construction plans and schedules are integrated, the plans and schedules are not reflective of actual project circumstances.

- There is a significant disconnect between construction need dates and procurement delivery dates.

- The schedule for the startup test program is in the early stages of development.

- The Consortium's project management approach does not provide appropriate visibility and accuracy to the Owners on project progress and performance.

- The Consortium's forecasts for schedule durations, productivity forecasted manpower peaks and percent complete do not have a firm basis.

- There is a lack of a shared vision, goals, and accountability between the Owners and the Consortium.

- The Consortium lacks the project management integration needed for a successful protect outcome.

- The overall morale on the project is low.

- The Contract does not appear to be serving the Owners or the Consortium particularly well.

- The issued design is often not constructible resulting in a significant number of changes. The construction planning and constructability review efforts are not far enough out in front of the construction effort to minimize impacts.

- There is significant engineering and licensing workload remaining (currently over 800 engineers) ITAAC closure will be a significant effort.

- Emergent issues potentially requiring NRC approval of LARs remain a significant project concern.

- The amount of stored material onsite is significant, creating the need for an extended storage and maintenance program.

- Construction productivity is poor for various reasons including changes needed to the design sustained overtime, complicated work packages, aging workforce etc.

- The indirect to direct craft ratio is high.

- Field non-manual turnover is high.

- The Owners do not have an appropriate project controls team to assess/validate Consortium reported progress and performance.

79. Thus, even after sanitizing the Original Bechtel Report, the Updated Bechtel Report still plainly showed – and the Board was therefore clearly aware – that the Nuclear Project was in serious jeopardy, and that internal SCANA leadership represented a significant roadblock to the Project.

80. The Santee Cooper Memo, referenced above, stated that "SCE&G…was aware

the [ORS] was trying to find out about the Bechtel Reports," an SCE&G official "did not answer questions from Santee Cooper about how 'to handle ... disclosure' of the report."

81.     By the issuance of the revised Bechtel Report, several private communications show that Defendants knew that SCANA's relationship with Westinghouse had deteriorated and that grave financing issues with the Nuclear Project were afoot. For example, on May 1, 2016, SCE&G partner Santee Cooper CEO Lonnie Carter sent a private letter to Jose Gutierrez, the interim President and CEO of Westinghouse: "Unfortunately, our experience with Westinghouse . . . has been set in a trend of continuous deceit   and non-transparency."

82.     In June 2016, Marsh sent a private email to Mamoru Hatazawa, Executive Officer of Toshiba Corporation (the parent company of Westinghouse) as follows: "We have no doubt that we have been the victim of financial malfeasance by [Westinghouse] and Toshiba." In another email on June 8, 2016, Marsh informed Mr. Hatazawa that "[w]e continue to be taken aback by what we see as Toshiba's lack of respect" and stated that Toshiba "is not acting honorably."

83.     This correspondence shows that SCANA had fundamental concerns over Westinghouse's ability to fund the Nuclear Project, and the deliver the Project on schedule, both of which were critical to Defendants' continued access to funding, including financing costs advanced by Plaintiffs.

84.     On February 26, 2016, SCANA filed its Annual Form 10-K report, which was signed by Defendants Marsh,  Aliff, Bennett, Miller, Cecil, Roquemore, Decker, Sloan, Hagood, Addison, Stowe,  Micali, and Trujillo through their attorney in fact, Ronald T. Lindsay.  The report stated that "[w]hen the New Units [Nuclear Units 2 and 3 under construction at the V.C. Summer Station]   are completed, our generating capacity and the percentage of total generating capacity represented  by nuclear sources are expected to increase." The report did not mention Bechtel, nor

any of the scheduling, design, or construction delays that the Project was experiencing.

85.    In March 2016, a month after receiving the Updated Bechtel Report, Marsh stated in a letter to shareholders that "[SCANA] continued to move forward and make substantial progress on initiatives important to our company such as our new nuclear construction project."

86.    On April 28, 2016, SCANA held a conference call [Q1 2016 Earnings Call] with analysts and investors to discuss the Company's first quarter 2016 earnings and operations.  During the conference call, SCANA's Chief Nuclear, Defendant Byrne answered an analyst's question regarding SCE&G's progress in constructing the V.C. Summer reactors.  Byrne reassured the analyst that SCE&G's contractors were "doing a tremendous job" and that progress was "better than we expected":

> [Analyst]: Okay. And then, I think you mentioned on the nuclear that the current critical path item is the shield building. And I know that you note in your report that you filed in February, that was mentioned there as well. *I was just wondering if you could update us on the status of that in terms of the components that are being fabricated and so forth.*
>
> [Byrne]: *Yes. Dan, the shield building is going probably better than we had anticipated.* Our concern for the shield building really came from the contractor, their concerns, and at the time that was Chicago Bridge and Iron. Now, Fluor has taken over, but we still retained the CB&I services crew that is doing that welding. So, even though CB&I power exited the consortium, the CB&I Services folks who are doing the containment vessel welding and the shield building welding stay, *and they're doing a tremendous job.*
> *Overall, I'd say the shield building is going a little better than expected.*

87.    On or around June 30, 2016, SCANA issued a "V.C. Summer Nuclear Station Units 2 & 3 Quarterly Report" to the ORS. This report stated that "[w]hile certain aspects of the work present challenges to the completion schedule, overall progress continues."

88.    On July 28, 2016, SCANA held a conference call [Q2 Earnings Call] with analysts and investors to discuss the Company's second quarter 2016 earnings and operations. During the conference call, Defendant Byrne again discussed the Nuclear Project's schedule with an analyst:

[Analyst]: So I wanted to follow up a little bit on the timeline and schedule on the project and specifically on the milestones. If you could provide a little bit more of an update there. And ultimately, if and/or when you expect to do -- or hear back from Fluor as to more of an integrated schedule update for the overall project.

[Byrne]: Yes, Julien, this is Steve. *The guaranteed suspension completion dates remain at August of 2019 for Unit 2 and August of 2020 for Unit 3. We don't see anything to change those.* Fluor's review of the schedule is really something that should conclude somewhere in the third quarter and then they will be giving that to Westinghouse. And remember that on the project now, we're just dealing with Westinghouse, Fluor is a subcontractor to Westinghouse. I don't expect anything necessarily to change from that review, save for perhaps the number of hours it might take and shifts that they would have to put on, that kind of thing. So the goal of that schedule review was to hold the dates constant and see what it would take to accomplish those dates. *So I don't expect anything dramatic to come from that.* **(Emphasis added).**

89.     On October 7, 2016, SCE&G "[p]ublished" a video on YouTube of Defendant Marsh speaking to reporters at the "V.C. Summer Media Day 2016." In the video, Marsh stated: *"Well they say well if you could do it again, would you make the same decision? And absolutely I would make the same decision. I feel as strongly today, probably even stronger today, than I did back in 2008 that this is the solution for us for a clean energy future." Marsh further stated that "with projects of this nature, you're gonna have some challenges . . . but we've been able to meet those challenges, make adjustments. to the contract, and continue progress on the project."* Marsh reiterated:

> *We're excited about where we are, we've had challenges, we've been able to work through those challenges,* because you're not gonna go through a project that's gonna be ten or twelve years without issues come up. I would offer if you've ever built a house, whether it took twelve months or eighteen months, you had a couple issues, you had a couple of change orders along the way, and the likelihood is that didn't reduce the cost of your house as you went through that process.

90.     On October 27, 2016, top SCANA insiders held a conference call [Q3 2016 Earnings Call] with analysts and investors to discuss the Company's third quarter 2016 earnings

and operations.  During the conference call, Defendant Byrne discussed Westinghouse with an
analyst:

> **[Analyst]**: Okay. And then I think in your last update report, there was also some
> discussion about Fluor maybe having some troubles in terms of staffing up for the
> evening shift or whatever. I wondered if you could update us on that.
>
> [Byrne]: Yes, Fluor, when they first came in, identified the need to increase
> staffing, and wanted to staff a full back shift or night shift because we'd been
> operating with a skeleton crew night shift or back shift up to that point. Initially,
> they had some difficulty in hiring, but I'd say that they recently have rectified that.
> . . . ***So they  are doing a good job,*** they're  trying  some innovative  things,
> implementing multilingual workforces, those kinds of things. ***So we are very happy
> with what Fluor is doing for us. They've been very successful recently.***

91.    Also on October 27, 2016, SCANA published a video on YouTube titled
"SCE&G Welcomes News Media to Nuclear Construction Site" featuring "members of the V.C.
Summer leadership team."  In the video, Defendant Byrne spoke to reporters on at the
"V.C.Summer Media Day 2016," and "gave the journalists an overview of the massive
construction  site before they boarded a bus to see it for themselves." Defendant  Byrne stated
that "[t]he pace of this project  is quickening.  Though we have run into some issues and
roadblocks in the past, most of those  issues and roadblocks are behind us."

92.    However, by this time the Owners were aware that its main contractor,
Westinghouse, was experiencing significant financial strain. In fact, by October, 2016, Santee
Cooper had requested that Defendants authorize the hiring of bankruptcy counsel to assess the
impact of the contractor's bankruptcy on the Project.

93.    On February 14, 2017, Toshiba announced that it would delay the release of its
quarterly earnings report due to concerns around the company's accounting controls, specifically
as they related to its U.S. nuclear subsidiary Westinghouse, which Toshiba estimated would require
it to take a $6.3 billion write-down related to the Project.

94.     Toshiba's chairman, Shigenori Shiga, announced his resignation to take responsibility for the massive write-down.

95.     Also on February 14, 2017, SCANA issued a quarterly report to the ORS that included "a revised completion schedule" for the Nuclear Project "of April 2020 and December 2020" – later than the previous completion dates of August 2019 and August 2020.

96.     Despite these announcements which revealed some – but not the full extent – of the troubles affecting SCANA, Westinghouse, Toshiba, and the Nuclear Project, Defendants continued to authorize significant expenditures on the Project through a Project Interim Assessment Agreement.

97.     On February 16, 2017, SCANA held a conference call [Q4 2016 Earnings Call] with analysts and investors to discuss the Company's first quarter 2017 earnings and operations. During the conference call, Marsh stated that "we still anticipate completing our two new nuclear units" and that "we are making substantial progress on these new plants":

> We continue to monitor Toshiba's financial situation and their proposed recovery plans. Although ideally Toshiba would be without these stresses, *we still anticipate completing our two new nuclear units,* which will enable us to provide our customers with safe, reliable energy for decades to come . . . . *As you can see from Steve's update, we are making substantial progress on these new plants and remain focused on continued progress toward their completion. Again, we will continue to monitor this situation closely and will alert you if we are made aware of any changes.*

(Emphasis added).

98.     During the same call, Defendant Byrne reassured analysts that SCANA would still reach its "2020 deadline" because "efficiency factors have increased significantly," things were "going much, much more smoothly," and that "we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us." Specifically, Byrne stated as follows:

29

**[Byrne]**: . . . When you say the second unit, you talking about the second new unit or are you talking about Unit 2, which is the first new unit?

**[Analyst]**: Sorry, yes, the second new unit and the 2020 deadline.

Byrne]: *What we've seen so far is that the efficiency factors have increased significantly ... and it's going much, much more smoothly. So I have a reasonable confidence in the efficiency gains for the second new unit.*

\*\*\*

**[Analyst]**: And also, I think in an earlier question you were talking about the various critical path, activities that you have coming up here over the first half of this year and going forward. At what point, how close are you guys to getting to the point where the construction project now becomes a more traditional construction project? And nuclear, in and of itself, is no longer what's the defining factor in terms of getting from here to there?

**[Byrne]**: *I think we're actually pretty close to that. . . . I think we're getting to that point very rapidly where the unique nuclear aspects and unique aspects of this new regulatory framework are getting behind us.*

99. On February 24, 2017, SCANA filed its annual report on Form 10-K,

signed by Defendants Marsh, Aliff, Bennett, Miller, Cecil, Roquemore, Decker, Sloan, Hagood,

Addison, Micali, and Trujillo through their attorney in fact, Ronald T. Lindsay. That report

stated:

> SCE&G and Santee Cooper have agreed to jointly own, contract the design and construction of, and operate the New Units, which will be two 1,250 MW (1,117 MW, net) nuclear units at SCE&G's Summer Station, in pursuit of which they have committed and are continuing to commit significant resources.

100. On April 12, 2017, Marsh, as well as Byrne, gave an "Ex Parte Briefing" to the

PSC concerning Westinghouse's March 29, 2017 bankruptcy filing. During the briefing, Byrne

stated that "[s]ince the bankruptcy, Westinghouse has been generally cooperative and responsive to

our requests for information"; that "we expect this cooperation to continue"; and that "work

continues on-site without substantial disruption."

30

101. During the briefing to the PSC, Marsh and Byrne presented information that the "Manufacturing Completion Schedule" for the V.C. Summer reactors was nearing completion.

102. The above statements were false and misleading when made because the Defendants were in possession of the Original Bechtel Report and were therefore aware that it would be virtually impossible for SCANA to complete work on the Nuclear Project by the end of 2020 and that "efficiency factors" never approached a level that supported a completion date of 2020.

103. On July 31, 2017, SCANA publicly announced that it would abandon construction of the nuclear project. Defendants pointed to the Westinghouse bankruptcy as the primary motivation for the abandonment, but later conceded the abandonment was also the result of delays and cost overruns, all of which had been on going on the Project for years.

## DUTIES OF SCANA'S BOARD

### A.    The Board's Fiduciary Duties

104. The Project to construct Units 2 and 3 was a unique undertaking engaged in through the authorization of the SCANA Board in conjunction with SCANA's partner Santee Cooper. The nature of this Project, and SCANA's role as the primary manager of the Project on behalf of itself as well as for Santee Cooper created heightened responsibilities for the Defendants towards Plaintiffs, who Defendants knew or had reason to know would be the source of financing for the Project.

105. By reason of their positions as directors, officers, and/or fiduciaries of SCANA, Defendants had the ability to make decisions, and authorize funding associated with the Project which impacted the Plaintiff Class. Accordingly, the Board owed and owes Plaintiffs fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost

31

ability to control and manage the Project in a fair, just, honest, and equitable manner.

106. Each director and officer of the Company owed Plaintiffs the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Project and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

107. The Board, because of their positions of control and authority as directors and/or officers of SCANA, was able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

108. Because of their directorial and/or executive positions with SCANA, each Board member had knowledge of material non-public information regarding the Project, including the Bechtel Reports. In addition, as directors and/or officers of a publicly held company, the Board had a duty to promptly disseminate accurate and truthful information with regard to the status of the Project.

109. To discharge their duties, the directors and officers of SCANA were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Project. By virtue of such duties, the officers and directors of SCANA were required to, among other things:

   a. Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b. Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements; and

   c. When put on notice of problems with, or misstatements about, the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct or misstatements and prevent their recurrence.

**B.     The Board Was Responsible for Overseeing and Monitoring the Project**

**1.     SCANA's Governance Principles**

110.     According to the Company's website, SCANA's Board "is charged with the responsibility of overseeing SCANA's business which is conducted by the officers, managers and employees, under the direction of the Chief Executive Officer ("CEO")."

111.     Among the Board's important duties is "review[ing], oversee[ing] and approv[ing] fundamental financial and business strategies and major corporate actions" and "review[ing] and assess[ing] identified significant risks facing SCANA and the alternatives for their mitigation." There was no "business strategy" or "corporate action" more fundamental to SCANA than the strategy relating to the Nuclear Project.

112.     As stated in the Company's 2017 Proxy Statement, SCANA's "business and affairs are managed under the direction of [its] Board of Directors. This includes the Board overseeing the types and amounts of risks undertaken." SCANA's 2017 Proxy further represents that all Board members have frequent interactions with the Company's risk officers:

> Also, at each quarterly meeting of the Board of Directors, the Board reviews and discusses a report prepared by the Company's Risk Management Officer and approved by the Risk Management Committee, which sets forth certain high-level risks identified by the Company's senior executive officers and others. The report also provides the current status of such high-level risks, and further identifies where the primary responsibility for risk oversight resides, including both at the Board and Committee level, and identifies the senior executive officer who has primary responsibility for oversight of the particular risk. 2017 Proxy at 18.

113.     In addition to those responsibilities, the Board performs the following functions:

a. approves and maintains a succession plan for the CEO, senior executives, and other senior leaders;

b. reviews the CEO's performance toward accomplishing the objectives of the strategic and business plans; and

33

c. reviews with the CEO his annual assessment of senior management and other senior leaders.

114.    The Board's committees monitor other specific aspects of SCANA's business. These committees include the Nuclear Oversight Committee, Audit Committee, Compensation Committee, Executive Committee and the Nominating and Governance Committee. These committees either have their own supplemental charters setting forth duties for their respective members in addition to the duties of board members generally, or their committee functions are described in the Company's proxy statements.

115.    The chart below, compiled from SCANA's public filings, illustrates the membership of these committees during all or part of the Relevant Period:

| Director/ Defenda | Audit | Compensation | Executive | Nominating and Governan | Nuclear Oversig |
|---|---|---|---|---|---|
| Aliff | X | | X | X | |
| Bennett | X | X | X | | X |
| Cecil | X | X | | | |
| Decker | | X | | | X |
| Hagood | X | | X | X | X |
| Marsh | | | X | | |
| Miller | X | | | X | |
| Roquemore | | X | X | | X |
| Sloan | | X | X | | X |
| Trujillo | | | | X | X |
| Micali | X | X | X | X | |
| Stowe | X | X | X | X | |

116.    These Board members served during the following times during the Relevant

34

Period:

    a.   Aliff served on three committees --Audit, Executive and Nominating and Governance – from 2016-2017;

    b.   Bennett served on four committees – Audit, Compensation, Executive and Nuclear Oversight – from 2015- 2017;

    c.   Cecil served on two committees – Audit and Executive – from 2015-2017;

    d.   Decker  served on two committees – Compensation and Nuclear  Oversight – from 2016-2017;

    e.   Hagood  served  on  four  committees – Audit, Executive, Nominating and Governance and Nuclear Oversight – from 2015-2017;

    f.   Marsh served on one committee – Executive – from 2016-2017;

    g.   Miller served on two  committees – Audit and Nominating  and  Governance – from 2015-2017;

    h.   Roquemore  served  on  three  committees – Compensation,  Executive and Nuclear Oversight – from 2015-2017;

    i.   Sloan served on three committees – Compensation, Executive and Nuclear Oversight—from 2015-2017;

    j.   Trujillo  served  on  two  committees – Nominating  and  Governance and Nuclear Oversight – from 2015-2017;

    k.   Micali served on four committees – Audit, Compensation, Executive and Nominating and Governance – from 2015-2017; and

    l.   Stowe served on four committees – Audit, Compensation, Executive and Nominating and Governance – in 2015.

117.   In addition, a majority of the Board served on each committee.

### Nuclear Oversight Committee

118.   The  following six directors – a majority of the Board –  served  on  the  Board's Nuclear  Oversight  Committee  (the  "Nuclear  Committee"):  Roquemore  (Chair),  Decker, Hagood, Sloan, Trujillo, and Bennett. According to the 2017 Proxy, the Nuclear  Committee is

tasked with "periodically tour[ing] the [Nuclear Project]." The Nuclear Committee shall "meet at least quarterly to monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics." 2017 Proxy at 17.

119. Additionally, the Nuclear Committee "reviews with the Institute of Nuclear Power Operations, on a periodic basis, its appraisal of our nuclear operations." *Id.* at 17. The Nuclear Committee also "routinely presents an independent report to the Board on the status of our nuclear operations." The committee met four times during 2016. *Id.*

**Audit Committee**

120. The following seven Board members – a majority of the Board – served on the Board's Audit Committee: Aliff (Chair), Bennett, Cecil, Miller, Hagood, Micali and Sloan. The 2017 Proxy states that the Audit Committee "reviews the scope and effectiveness of our risk management program which includes the review of quarterly reports pertaining to significant risks" and "reviews major issues regarding accounting principles and financial statement preparation as well as reviews the Company's quarterly and annual financial statements before submission to the Board of Directors for approval and prior to dissemination to our shareholders, the public and regulatory agencies." 2017 Proxy at 14-15.

121. As further described in the Audit Committee Charter, the committee shall provide assistance to the Board with respect to "the integrity of SCANA's financial statements, SCANA's compliance with legal and regulatory requirements[.]" The Audit Committee is also charged with overseeing "SCANA's systems of disclosure controls and procedures and systems of internal controls over financial reporting."

122. The Audit Committee is tasked with reviewing "the appointment, replacement or reassignment of the Internal Auditor or Corporate Compliance Officer and certain other Officer

positions as appropriate." SCANA's applicable charter in effect during the Relevant Period specifically provides that the job of the Audit Committee includes, among other things, the following:

- Review the status of significant risk(s) for which oversight is assigned to the Committee by the Board of Directors;

- Discuss SCANA's major financial risk exposures and the steps management has taken to monitor and control such exposures;

- Review with the external auditors and Audit Services the adequacy and effectiveness of SCANA's internal controls over financial reporting; and

- Review with any disclosure committee of SCANA the effectiveness of SCANA's disclosure controls and procedures.

123. The 2017 Proxy details the Audit Committee's risk function and oversight of the Company's Risk Management Committee: "The Board has established an executive senior officer-level Risk Management Committee which reports directly to the Audit Committee of the Board…At each quarterly meeting of the Board, the Audit Committee receives a report from the Risk Management Officer. Several members of the Risk Management Committee are also present at the Audit Committee meetings to provide details of the Committee's work and respond to questions raised by Audit Committee members." 2017 Proxy at 18.

### Compensation Committee

124. Seven directors served on the Board's Compensation Committee: Bennett (Chair), Cecil, Decker, Roquemore, Micali, Stowe and Sloan. According to the Compensation Charter, the committee shall "assist the Board in the oversight of matters relating to compensation plans, compensation of SCANA's executives, SCANA's long-term strategic plans and performance in regard to management of human resources."

125. As further described in the Company's 2017 Proxy, the Compensation Committee:

reviews and makes recommendations to the Board with respect to compensation plans, recommends to the Board persons to serve as our senior officers and as senior officers of our subsidiaries, and recommends to the Board salary and compensation levels, including all benefits, for our officers and officers of our subsidiaries. The Committee also approves goals and objectives with respect to the compensation of the Chief Executive Officer, evaluates the Chief Executive Officer's performance and along with the other independent directors sets his compensation based on this evaluation. 2017 Proxy at 15.

126. According to the Compensation Committee Charter, the Compensation Committee is charged with the following duties:

- Recommend to the Board salary and compensation levels, including fringe benefits, for all officers of SCANA and its subsidiaries;

- Review and make recommendations to the Board with respect to all SCANA executive compensation plans, including incentive compensation plans and equity based plans;

- Review SCANA's operating performance relative to the bonus and incentive programs;

- Review and approve corporate goals and objectives with respect to the compensation of the Chief Executive Officer, evaluate the Chief Executive Officer's performance in light of those goals and objectives and, either as a Committee or together with the other independent directors (as directed by the Board), determine and approve the Chief Executive Officer's compensation based on this evaluation;

- Produce an annual report on executive compensation for inclusion in SCANA's proxy statement, in accordance with applicable rules and regulations of the Securities and Exchange Commission;

- Recommend to the Board persons to serve as senior officers of SCANA and its subsidiaries;

- Review SCANA's overall succession and continuity planning with the Chief Executive Officer; and

- Review the level of SCANA stock ownership by SCANA's executive officers to determine whether each executive officer is in compliance with the Company's minimum ownership requirement, and, as may be requested and appropriate, grant temporary waivers from such requirements.

**Nominating and Governance Committee**

127. The following six Board members served on the Board's Nominating and Governance Committee:  Aliff, Hagood, Miller, Trujillo, Micali and Sloan.  The Nominating and Governance Committee Charter states that the committee's purpose is to "identify individuals qualified to become members of the Board and to recommend such individuals to the Board to be Board nominees for directors, as well as to develop and recommend to the Board corporate governance principles, to recommend Board committee membership and responsibilities, and to oversee the evaluation of the Board, its committees and management."

128. SCANA's 2017 Proxy states that the committee "annually reviews the membership and responsibilities of Board committees and recommends to the Board any changes that may be appropriate, and reviews and revises as necessary, SCANA's Governance Principles, taking into account provisions of the Securities Exchange Act of 1934, the listing standards of the New York Stock Exchange and any other source or sources the Committee deems appropriate."  2017 Proxy at 16.

129. The Nominating and Governance Committee is charged with the following duties and responsibilities, among others:

- Evaluate the qualifications and performance of incumbent directors and determine whether to recommend them for re-election to the Board;

- Monitor the orientation and education needs of directors and recommend action to the Board, individual directors and management where appropriate;

- Review the level and form of director compensation and recommend changes to the Board for consideration and approval. In determining compensation for non-employee directors, the Committee shall be guided by the following goals: compensation should fairly pay directors for work required in a company of SCANA's size and scope; compensation should align directors' interests with the long-term interests of shareholders; and the structure of the compensation should be simple, transparent and easy for shareholders to understand;

- Review the status of significant risk(s), if any, for which oversight has been assigned to the Committee by the Board of Directors;

- Evaluate periodically the desirability of, and recommend to the Board, any changes in the size, composition, organization and operational structure of the Board;

- Review annually membership and responsibilities of Board committees and recommend to the Board any changes that may be appropriate;

- Review annually and revise as necessary, SCANA's Governance Principles, taking into account provisions of the Securities Exchange Act of 1934 (the "Exchange Act"), the listing standards of the New York Stock Exchange…and any other source or sources the Committee deems appropriate; and

- Initiate and oversee annually an evaluation of (i) the quality, sufficiency and timeliness of information furnished by management to the directors in connection with Board and committee meetings and other activities of the directors, (ii) the Board's effectiveness, (iii) the composition, organization (including committee structure, membership and leadership) and practices of the Board, (iv) tenure and other policies related to the directors' service on the Board, and (v) corporate governance matters generally; and recommend action to the Board where appropriate.

### Executive Committee

130. The following eight Board members – a majority of the Board – served on the Executive Committee: Marsh (Chair), Aliff, Bennett, Hagood, Roquemore, Sloane, Micali, and Stowe. The 2017 Proxy adds that the Executive Committee "exercises the powers of the full Board of Directors when the Board is not in session or cannot be called into session in a timely manner to deal with a time sensitive circumstance, with the exception of certain powers specifically reserved to the full Board of Directors by statute." 2017 Proxy at 16.

131. Further, "the Committee also advises the Chief Executive Officer on other matters important to the Company (due to the size of our Board of Directors, and availability of our Directors to us, the Executive Committee is rarely required to meet)." SCANA's CEO "from time to time sought the advice of the Executive Committee." *Id.* at 16.

**The Company's Code of Conduct and Ethics**

132.  SCANA's Code of Conduct and Ethics (the "Code") outlines how SCANA is to "conduct business using the highest ethical standards" as "[i]t is an obligation we have to our customers, our shareholders, our communities and ourselves." In describing the Code, Defendant Marsh states that the Code "mandates that we conduct our business ethically and fairly, following all the rules and regulations that govern us."

133.  The Code states that "[e]xpectations of professional conduct apply to all employees, contractors, Board members or agents of SCANA." The Code also states that Board members must, among other things:

- Behave honestly and avoid illegal, unethical or improper conduct;

- Have a practical working knowledge of the policies, laws and regulations affecting your job responsibilities;

- Report any actual or suspected violation of a law, rule or regulation through your management chain or other available reporting resources. If the concern is related to accounting, internal controls, auditing matters or financial reporting irregularities, contact the Corporate Compliance & Privacy Officer;

- Cooperate with any investigation of alleged wrongdoing; and

- Be aware of the appearance of wrongdoing.

134.  Additionally, members of "SCANA management" must, among other things:

- Be an ethical leader;

- Promptly and properly address situations before they escalate; and

- Ensure systems and procedures are in place to protect Company assets and legally achieve Company goals.

135.  In violation of their internal policies, procedures, and governing code of conduct, Defendants consciously or recklessly disregarded extensive red flags that the Project could not

be completed on schedule and within the original budget. Yet, despite knowledge of the construction, design, and procurement issues plaguing the Project, Defendants repeatedly authorized SCANA to continue construction and to seek funding for the Project from Plaintiffs.

136. Throughout the Project, Defendants were aware of repeated cost-overruns, delays, and design and construction problems. The problems were significant enough that in or around August 2015, the Board – only after Santee Cooper's insistence – authorized the Company to seek a project assessment by Bechtel to determine whether the Nuclear Project was viable.

137. In November 2015 and February 2016, respectively, Defendants were confronted with the findings in the Bechtel Reports, which made clear that the project could not be completed by 2020 and was potentially unachievable under current conductions. In March 2016, the Board of SCANA met with the Board of Santee Cooper to discuss the fact that Westinghouse was at high risk of bankruptcy, threatening the viability of the project.

138. The circumstances set forth herein would have led a reasonable Board to review the efficacy of abandoning the Project well in advance of the actual date of Project abandonment.

139. Defendants breached their fiduciary duties by willfully ignoring these unmistakable signs that the Nuclear Project was in fundamental jeopardy. Instead, Defendants doubled down and caused SCANA to seek further budget increases, knowing that the mishaps on the Project were caused, at least in part by Defendants own failures with respect to oversight and management.

140. Defendants Bennett, Decker, Hagood, Roquemore, Sloan, and Trujillo had special responsibilities as members of the Nuclear Committee, including to "monitor, discuss, and evaluate our nuclear operations, which include regulatory matters, operating results, training and other related topics." Indeed, the Nuclear Committee also "periodically tour[ed] the V.C. Summer Nuclear Station and its training facilities." Thus, these six Defendants' breaches are particularly

egregious because they had both heightened duties and greater access to the truth about the Project's problems.

141. Defendants also breached their fiduciary duties by purposefully concealing material information from both regulators and the public about the status of the Project for the sole purpose of continuing to increase the Project budget, and corresponding compensation to Defendants and SCANA.

142. Defendants who served on the Nominating and Governance Committee also breached their fiduciary duties by failing to nominate qualified directors. Specifically, these Defendants failed to nominate any directors who had experience relevant to overseeing a massive nuclear construction project. This was especially indefensible in view of specific internal the scale of the Project and its impact outside of SCANA.

143. Likewise, Defendants who served on the Compensation Committee also breached their fiduciary duties by approving compensation packages for the Officer Defendants including short-term incentive payments based specifically on purported achievements of goals regarding the Project, even though they knew or recklessly disregarded that the Project was being seriously mismanaged and was extremely unlikely to be completed.

144. Defendants who served on the Audit Committee also breached their fiduciary duties by failing to exercise their risk management duties with respect to the Project and failing to properly exercise their duties as members of that committee as they caused, or allowed, SCANA to issue false and misleading statements relating to the Nuclear Project.

145. As a result of Defendants' fiduciary breaches, Plaintiffs have been extensively and irreparably harmed. By directing and authorizing construction on the Project to continue long past the point when it was prudent, Defendants have incurred billions of dollars in expenses

while pursuing an unachievable project, which will never provide Plaintiffs with any benefit.

146. Defendant Marsh made false and misleading statements to regulators and to the public about the project's status and likelihood of completion. Further, Marsh actively *concealed* crucial information from both regulators and the public, including, *inter alia*, both Bechtel Reports.

147. The Original Bechtel Report states that Marsh met with Bechtel representatives on October 16, 2015 – *several weeks before the report*.

148. After receiving the Original Bechtel Report, Marsh instructed SCANA's outside counsel to have Bechtel weaken its findings and remove key portions of the report. A timeline that Santee Cooper CEO Lonnie Carter sent to SCANA CEO Kevin Marsh complaining about delays includes this Nov. 12, 2015, entry:

> "Bechtel Assessment Report…[w]eeks go by with…wrangling over [SCANA's attorney's] rejection of initial report, redactions, timeline removal, critique of project management."

149. According to internal Santee Cooper documents, even after receiving the Updated Bechtel Report, Marsh determined not to disclose the report out of fear of shareholder lawsuits and potential personal liability. Marsh was also directly on notice by March 2016 that Westinghouse was at high risk of bankruptcy, threatening the viability of the Nuclear Project.

150. As set forth further above, the Defndants were tasked by SCANA's governance principles with monitoring the performance of Company management, as well as "review[ing], oversee[ing] and approv[ing] fundamental financial and business strategies and major corporate actions" and "review[ing] and assess[ing] identified significant risks facing SCANA and the alternatives for their mitigation."

151. The Project was clearly a major corporate action and also presented SCANA with significant risks.

152. Defendants repeatedly touted Nuclear Project as critical to SCE&G's ability to meet growing customer demands for electricity. For example, in the Company's February 12, 2009 investor call for the fourth quarter of 2008, Defendant Addison said: "Our forecast continue[s] to show that we will need the additional generation our new nuclear units will provide in order to support load growth in our system," and Defendant Marsh said that the Company's "request to build the new nuclear plants is a key milestone in our efforts to meet South Carolina's growing need for clean, reliable energy."

153. Yet, in pursuing the Project, Defendants involved Plaintiffs, whose own generation needs did not support the massive Project, or its associated expenses.

154. The Project was also a constant focus of SCANA's presentations and investor conference calls, and the Company sometimes held separate conference calls solely for the purpose of discussing the Nuclear Project, *e.g.* on August 11, 2014. The Project also attracted extensive analyst scrutiny, with multiple analysts asking in-depth questions about the project during each of the Company's quarterly investor conference calls throughout the Relevant Period.

155. The Project was so significant to SCANA that SCANA's website had a featured, dedicated page just for the project, including news links, construction videos and construction photos as well as regulatory filings and investor information.

156. Further, the Project had, an enormous financial impact on the Company. When the costs increased, the Defendants profited.

157. These increased costs included costs passed on to Plaintiffs.

158. As such, the Board of Directors had a clear duty to closely monitor the Project

and to stay abreast of news concerning its progress and viability. The Board of Directors' fiduciary breaches in light of the Project's centrality to the Company's strategy are all the more egregious.

159. Indeed, the Project was of such critical importance to the Company that it is inconceivable that the Directors were unaware of news concerning its progress and viability unless they consciously or recklessly ignored such information.

160. Prior to and throughout the construction, the Directors received unmistakable information showing that the Nuclear Project was failing – over 18 months before the project was finally abandoned in July 2017. This included, *inter alia*:

- Rampant cost overruns and delays, many of which were publicly reported in news outlets and which required SCANA to repeatedly seek increased costs and schedule changes from the PSC, and to modify the governing contract for the Project;
- Unheeded concerns expressed by Santee Cooper that an outside construction manager was needed;
- The Original Bechtel Report in November 2015;
- The Updated Bechtel Report in February 2016;
- A March 2016 meeting between the Board and the board of Santee Cooper at which the strong possibility of a Westinghouse bankruptcy was discussed;
- Emails from Santee Cooper executives throughout 2016 continuing to urge SCANA to hire an outside construction manager and warning that "SCANA's project management team …. does not have the comprehensive skills and depth of experience necessary in engineering, scheduling, project controls and construction to manage a large new build project with complexities";
- Morgan Stanley's downgrade of SCANA in June 2016 on concerns about Toshiba and Westinghouse's continued financial viability;
- News reports in major U.S. press outlets at the end of December 2016 that Toshiba had announced that it faced billions of dollars in likely write-downs due to losses stemming from work on the Nuclear Project and one other nuclear project;
- Toshiba's widely reported announcement on February 14, 2017, that it would take a $6 billion write-down related to its nuclear program, and that it might sell Westinghouse, calling into question the continued viability of the Nuclear Project;

and

- Westinghouse's filing for bankruptcy in March 2017.

161. The Defendants were made aware of these red flags, as all of them had joined the Board by, at latest, October 2015. In spite of these and other red flags, the Directors took no action to mitigate the Company's losses and potential liability from the Nuclear Project.

162. Further, as set forth above, Defendants face a substantial likelihood of liability for causing SCANA to issue false and misleading statements.

163. The conduct set forth above and herein directly and proximately caused significant financial harm to Plaintiffs, who Defendants knew or should have known would be forced to bear the costs of the Project.

**FOR A FIRST OF ACTION**
**(Breach of Fiduciary Duties)**

164. Plaintiffs reallege the above as if stated verbatim and reincorporate all paragraphs into this cause of action.

165. Each of the Defendants was an Officer or a member of SCANA's Board at relevant times.

166. As such, each Defendant was aware of the Project, and its role in increasing the financial virility and profile of SCANA, and each owed those impacted by the Project the highest obligations of care and loyalty.

167. Each of the Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry in at least the following ways:

   a. Overseeing, endorsing, and participating in the gross mismanagement of the Project;

   b. Ignoring or consciously disregarding the many red flags related to the Project's impending failure;

c.  Deliberately concealing material information about the Project, including the findings of the Bechtel Reports, from regulators and the public,  in violation of state and federal law;

d.  Failing to maintain proper internal controls;

e.  Accepting incentive compensation tied to their management of the Project, which they were in fact mismanaging and which was failing;

f.  Authorizing incentive compensation tied to management of the Project, despite clear information that the Project was over-budget and off-schedule;

g.  Failing to effectuate policies and/or procedures related to governance of a new nuclear construction Project;

h.  In the event such policies and/or procedures existed, failing to implement and/or monitor the execution of such policies and/or procedures;

i.  Making, and allowing SCANA to make, public statements regarding the Project that were false and misleading due to the lack of feasibility of its completion, which also resulted in the artificial inflation of the  Company's share price;

j.  Allowing for inadequate risk controls over the Company's policies and practices, which allowed the Company to continue with the failing Project, regardless of viability and the pervasive problems that existed;

k.  Engaging in abuse of control and gross mismanagement of SCANA's Officers;

l.  Failing to appropriately assess and/or mitigate the risks of cost overruns and delays associated with the Project, which Defendants knew or should have known would directly impact the Plaintiffs;

m. Continuously requesting increases in the Project Budget, to be borne by Plaintiffs, despite Defendants' lack of trust in the Project construction consortium;

n.  With respect to the Defendants who served on the Nuclear Committee, grossly failing to adequately exercise their special oversight duties with respect to the unfeasible Nuclear Project;

o.  With respect to the Defendants who served on the Compensation Committee, approving "incentive compensation" paid to the Officer Defendants under  false pretenses of successful management of the Nuclear Project;

p.  With respect to the Defendants who served on the Nominating and Corporate Governance Committee, failing to nominate any directors with qualifications

relevant to overseeing a nuclear construction project;

q.  Authorizing and passing along to Plaintiffs' "Owners Costs" which were exorbitant and inflated, and which included bonuses and compensation associated with SCANA's personnel on the Project; and

r.  With respect to the Defendants who served on the Audit Committee, failing to fulfill their duties to ensure that SCANA issued accurate statements about  the Nuclear Project and to properly fulfill their risk-management duties.

168.  Defendants, individually and in concert, engaged in the above referenced conduct in intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to the Plaintiffs to protect its rights and interests.

169.  In breach of their fiduciary duties owed to the Plaintiffs, Defendants willfully participated in misrepresentations related to the progress of the Company's Nuclear Project, risk controls, and internal and disclosure controls, failed to correct the Company's public statements, and failed to fully inform themselves prior to making decisions as directors and officers, rendering them personally liable to the Company for breaching their fiduciary duties.

170.  Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the status of the Project and they failed to correct the Company's public statements.

171.  Defendants had actual knowledge of the misstatements and omissions of material facts set forth in this Complaint, or acted with reckless disregard for the truth,  in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly  and for the purpose and effect of increasing Project costs, which, in turn increased payments to SCANA by Plaintiffs.

172.  These actions were not a good-faith exercise of prudent business judgment to

protect and promote the Company's corporate interests.

173. Additionally, Defendants have specific fiduciary duties as defined by the Company's corporate governance documents, including the Code of Conduct and Ethics, Governance Principles and the charters of various Board committees that, had they been discharged in accordance with Defendants' obligations, would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

174. Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Company.

175. Defendants' actions as detailed in this Complaint were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

176. The Board is charged with the responsibility of overseeing the Defendants' business which is conducted by the officers, managers and employees, under the direction of the Chief Executive Officer ("CEO"). The Officers of the Defendants also have the responsibility of acting honestly, fairly and with a fiduciary intent so as to protect the customers of the Company but in this instance, the customers of Santee Cooper.

177. The BOD decisions, actions, and inactions were not in good faith, were inconsistent with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and were not in the best interests of Santee Cooper customers.

178. At all times relevant to this Complaint the Defendants knew or should have known that costs associated the Project had been shifted to the Plaintiffs, all while understanding that the reactors would become an asset to be held by and for the benefit of Defendants.

179. Further, Defendants had a duty to uphold care and loyalty to the Plaintiffs, all those similarly situated, to act in good faith and with due regard to the interests of the Plaintiffs,

to properly manage their money, report the status of the Project honestly, and prudently spending the Plaintiffs' monies, protecting the flow of money so as not to pay for costs and expenses that were not proper and conscientiously managing the Project.

180. Defendants violated and took advantage of this special relationship by continually mismanaging the nuclear project, misrepresenting the financial condition of the project, and abandoning the project, despite having knowledge for years prior that the Project was failing; all the while requiring Plaintiff and the Class to fund the nuclear project.

181. The Defendants made statements to the Public Service Commission, published information on their websites, issued joint press releases and informed the public, regulators, the PSC, the South Carolina Legislator that the Project was progressing as expected.I In the Quarterly Report to the South Carolina Office of Regulatory Staff, Pursuant to PSC Case 2009-104(A) for Quarter ending March 31, 2014, the Defendants made the statement that: "All outstanding BLRA construction milestone completion dates will be updated when this new schedule has been produced, reviewed and approved." In the Quarterly Report to the South Carolina Office of Regulatory Staff, Pursuant to PSC Case 2009-104(A) for Quarter ending June 30, 2014, the Defendants stated that "The outstanding construction milestone completion dates will be updated when the Revised Fully Integrated Construction Schedule has been produced, reviewed and finalized," and that they were working with Engineers at Bechtel to amend their reports in order to have more favorable findings on the completion date and the status of the Project.

182. Upon information and belief, the Defendants were aware of the issues raised by the Bechtel reports. The Defendants attempted to hide the Bechtel report, have it modified and avoid releasing it to the public. They hired an attorney to attempt to claim some special privilege

so as not to have to disclose the contents to the public. While the report of the Bechtel Company was eventually released, the delay in releasing the report caused the public, the S.C. Legislature and the PSC to be further misled and further added to the cost of the Project.

183. However, in the Quarterly Report to the South Carolina Office of Regulatory Staff, filed in PSC Case number 2009-104(A), on June 30, 2016, the Defendants did not take any steps to make the public, PSC, or any other entity aware of the delayed completion dates, or that the Project was experiencing significant failures.

184. The Defendants reported in the Quarterly Report that the construction of the Project was only "delayed by fourteen months or less compared to the schedule approved by the Commission in Order No. 2015-661." However, based on information and belief, they knew that the Project would not even be completed by 2020.

185. The Defendants breached their fiduciary duties to the Plaintiffs by, among other things, woefully mismanaging and overseeing the Project as set forth above, charging or allowing charges that were not proper and reporting these charges and costs to the PSC to obtain more funds which improperly enriched the Defendants.

186. As a result of the breaches of the Defendants' fiduciary duties they caused the Plaintiffs to suffer ACTUAL, CONSEQUENTIAL and PUNITIVE DAMAGES.

## FOR A SECOND CAUSE OF ACTION
### (Negligence and/or Gross Negligence as to all Defendants)

187. Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

188. At all times relevant to this Complaint, the Defendants were responsible for managing the construction of the Project. As such they voluntarily assumed the duties of supervision, oversight, and mangement of the Project to Santee Cooper customers.

189. Defendants breached their duties owed to the Plaintiffs, in one or more of the following ways:

a. Failing to ensure ensure adequate policies and procedures existed regarding construction of the Project;

b. Mismanaging the Project;

c. Failing to use appropriate oversight, quality assurance and/or quality control in executing their managerial duties on the Project;

d. In the event such policies or procedures were in place, failing to ensure compliance with the policies and procedures;

e. Failing to ensure the Project was constructed according to industry standards and/or good utility practices;

f. Failing to ensure accurate and transparent representations were made about the Project to members of the public, bondholders, and regulatory entities and in making false and material misrepresentations;

g. Failing to ensure only those costs necessary to the reliable provision of electric service were assessed as to direct and indirect customers; and

h. Violating the duty to exercise reasonable oversight and management of the Project;

i. Failing to create and enforce appropriate policies and procedures regarding construction of the Project;

j. Failing to adequately and accurately apprise Project financiers, regulatory bodies, and members of the public of the status of the Project;

k. Failing to exercise due care with regard to decisions made on the Project, including decisions to expand ownership of the Project to third parties;

l. Imposing unreasonable or exorbitant costs on financiers of the Project, including the Santee Cooper direct and indirect customers;

m. Failing to ensure the Project was proceeding according to good utility practices;

n. Failing to ensure the existence of a Project schedule;

o. Failing to staff the Project with competent employees knowledgeable in the field of nuclear construction;

    p.  Failing to supervise and ensure that monies collected from customers for the Project were not being squandered through poor construction practices or unreasonable activities;

    q.  Assessing Plaintiffs for executive compensation and bonuses attributable to Project success when no such success existed; and

    r.  Such other duties as may be determined during discovery or the trial of this matter.

201.  As a result of the Defendants' conduct as set forth herein, Plaintiffs lost the beneficial use of two nuclear power Units (2 and 3), and will receive neither the benefit of these units in the future nor the associated benefits of clean, efficient, and cost effective energy, but will continue to incur costs associated with these units despite the loss of their use. Plaintiffs also suffered property damage and loss of use in the form of their money wrongfully taken to fund the Project.

202.  As a direct and proximate result of the Defendants negligent, grossly negligent, and reckless conduct, Plaintiffs have suffered substantial losses and are entitled to recover all actual and consequential damages, including, but not limited to, property damages and loss of use, punitive damages, and such other damages as may be determined in law or equity.

## FOR A THIRD CAUSE OF ACTION

### (Unjust Enrichment – As to All Defendants)

203.  Plaintiffs reallege the preceding paragraphs as though repeated verbatim herein.

204.  Throughout the pendency of the Project, Defendants by and through their various compensation and nuclear committees, assessed Project costs which were passed on to Plaintiffs.

205.  Defendants knew or should have known that Plaintiffs were paying significant Project Costs.

206. In addition to costs attributable to construction, Defendants also passed onto Plaintiffs costs associated with Defendants' compensation, including bonus compensation

expressly tied to progress on the project. *See* Article, May 9, 2018, "Santee Cooper Customers helped pay SCANA Execs' bonuses for failed VC Summer Project," Avery Wilks, The State, https://www.thestate.com/news/politics-government/article210782644.html.

207.  Plaintiffs did, in fact, pay costs associated with the Project, including significant costs associated with Defendants' compensation and bonuses.

208.  Even after abandoning the Project, Defendants have never returned the Project Costs to Plaintiffs, but have instead retained and benefitted from those funds.

209.  The facts and circumstances of this case, as set forth more fully above, demonstrate that Defendants should not be allowed to retain the benefit of the Project costs, which Plaintiffs paid.

210.  Accordingly, Plaintiffs are entitled to an equitable award of restitution associated with all Project funds that Plaintiffs paid.

**WHEREFORE**, Plaintiffs pray this Court certify a class pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure and issue judgment against all of the Defendants for **ACTUAL**, **CONSEQUENTIAL** and **PUNITIVE DAMAGES**, for attorneys' fees, for the costs of this action and for such further relief in law or equity as this Court deems just and proper.

**[SIGANTURE BLOCK ON FOLLOWING PAGE]**

Respectfully submitted,

**BELL LEGAL GROUP, LLC**

*s/ J. Edward Bell, III*
J. Edward Bell, Esq. (FED ID 1280)
Gabrielle A. Sulpizio, Esq. (FED ID 12715)
BELL LEGAL GROUP
219 N. Ridge Street
Georgetown, SC 29440
(843) 546-2408 Phone
(843) 546-9604 Fax

ebell@edbelllaw.com

October 11, 2019
Georgetown, South Carolina